IN the MATTER OF the COMPLAINT AGAINST the Honorable Christ T. SERAPHIM.

Supreme Court

*No. 79–1729–J. Argued June 27, 1980.—Decided July 7, 1980.*
(Also reported in 294 N.W.2d 485.)

For the Judicial Commission there was a brief by *Henry A. Field, Jr., Molly K. Martin* and *Boardman, Suhr, Curry & Field,* of Madison, and oral argument by *Mr. Field* and *Ms. Martin.*

For Judge Seraphim there was a brief and oral argument by *James P. O'Neill* and *Gerald P. Boyle,* both of Milwaukee.

Amicus Curiae brief was filed by *John H. Bowers* and *Lawton & Cates* of Madison, attorneys for The Voluntary Association of Trial Judges of Wisconsin.

PER CURIAM. This is a review of the findings of fact, conclusions of law and recommendations made by the judicial conduct panel following its hearing on the formal complaint brought by the judicial commission against the Honorable Christ T. Seraphim, Circuit Judge for Milwaukee County and respondent herein.

Respondent has been a circuit judge in and for the County of Milwaukee since he was elected to that office

in 1972. Prior to that time he served as a county judge and presided in the misdemeanor court in Milwaukee County, a position to which he was first appointed in May of 1960.

On April 5, 1979, the judicial commission notified the respondent that it was investigating his possible misconduct pursuant to the authority granted it under sec. 757.-85, Stats. Respondent was informed of the substance of the allegations against him on September 14, 1979, and was given an opportunity to respond both orally and in writing. The commission determined that there was probable cause to believe that respondent had engaged in misconduct and filed a formal complaint with this court on November 12, 1979.

On November 13, 1979, this court ordered the chief judge of the court of appeals to select a judicial conduct panel and refer the matter to the panel for proceedings in accordance with the provisions of sec. 757.89, Stats. A panel was convened and, following scheduling and prehearing conferences, a formal hearing on the allegations contained in the complaint was commenced on February 25, 1980. The hearing lasted a total of eight days, during which the panel heard testimony from over fifty witnesses and considered over one hundred exhibits. The transcript of the hearing covers 1,808 pages.

On the basis of the evidence presented, the panel made extensive findings of fact and conclusions of law. It concluded that the respondent had engaged in judicial misconduct in that he had wilfully violated Rules 8, 11, 15, 16 and 17(e) of the Code of Judicial Ethics.[1] Based upon its findings and conclusions the panel recommended that the respondent be removed from office or, in the al-

---

[1] Sec. 757.81(4), Stats., defines "misconduct" for purposes of judicial disciplinary proceedings as follows:

"(4) 'Misconduct' includes any of the following:

"(a) Wilful violation of a rule of the code of judicial ethics.

ternative, that he be suspended from office without pay for not less than three years.

"(b) Wilful or persistent failure to perform official duties.

"(c) Habitual intemperance, due to consumption of intoxicating beverages or use of dangerous drugs, which interferes with the proper performance of judicial duties.

"(d) Conviction of a felony."

The rules and standards of the Code of Judicial Ethics found to have been violated are as follows:

"Rules"

"The court promulgates the following rules because the requirements of judicial conduct embodied therein are of sufficient gravity to warrant sanctions if they are not obeyed:

". . .

"8. A judge shall not accept gifts from lawyers, groups, or persons whose interests are, are likely to be, or have been before him in his official capacity.

". . .

"11. A judge shall not indulge in gross personal misconduct.

". . .

"15. A judge shall not, while a judicial proceeding is pending, make any comment upon its merits, or make any comment which might affect its outcome or preclude a fair trial.

"16. An aggravated and persistent failure to comply with the Standards of this code shall be deemed a rule violation.

"17. . . .

"(e) The report shall include the source of all income from personal services other than judicial (not including reimbursed expenses), and the source of all gifts, other than the immediate family, when the item of income or the value of the gift exceeds $100."

"Standards"

"The following standards set forth the significant qualities of the ideal judge:

"1. A judge should be mindful that ours is a government of law and not of men and he should not permit his personal concept of justice to override the law. He should administer his office with due regard to the integrity of the system of law itself, remembering that he is not a repository of arbitrary power but a judge under the sanction of law.

Under sec. 757.91, Stats., our task is to review the findings of fact, conclusions of law and recommendations made by the panel and to determine what discipline, if any, is appropriate. But before we begin that task we

"2. A judge should support the United States and Wisconsin constitutions and fearlessly observe and apply their fundamental limitations and guarantees.

"3. A judge should be temperate, attentive, patient, industrious, and, above all, impartial. He should administer the law free of partiality and the appearance of partiality. To that end he should avoid membership in, or association with, an organization whose objectives, policies, or activities are incompatible with the fair and evenhanded administration of justice.

". . .

"5. A judge should cooperate with other judges as members of a common judicial system to promote the satisfactory administration of justice. He should respect all expressions of judicial opinion.

"6. A judge should be considerate and courteous to litigants, jurors, witnesses, attorneys, and all in attendance upon the court. He should require similar conduct on the part of clerks, court officials, and counsel. He should conduct all judicial proceedings so as to reflect the importance and seriousness of the inquiry to ascertain the truth.

". . .

"9. A judge should conduct the work of his court with dignity and decorum and without interference which might detract from the proper courtroom atmosphere. He should so conduct himself during trials and hearings that his attitude, manner, or tone toward counsel or witnesses will not prevent the proper presentation of the cause or the ascertainment of the truth. He may properly intervene whenever he considers it necessary to clarify a point or expedite the proceedings. He should not make an unnecessary display of learning, express a premature judgment, or add to the embarrassment or timidity of witnesses or counsel.

". . .

"12. A judge should not seek to be extreme, peculiar, spectacular or sensational in his judgment or in his conduct of the court. He should not compel persons brought before him to submit to discipline of his own devising without authority of law. In imposing sentence he should not seek popularity or publicity by exceptional severity or undue leniency."

are first called upon to decide several issues respondent has raised as to the constitutionality of the judicial disciplinary procedure here being used for the first time.

Respondent first contends that the disciplinary procedure established by the legislature is void as an unconstitutional exercise of judicial power. Relying on *In re Cannon,* 206 Wis. 374, 240 N.W. 441 (1932), and *Integration of Bar Case,* 233 Wis. 6, 11 N.W.2d 604 (1943), in which this court recognized its inherent power over the judicial branch of state government, respondent contends that the procedure established by the legislature for disciplining judges is unconstitutional because it invades the province of an independent judiciary and "emasculates" the judicial power vested in this court by Art. VII, sec. 3 of the Wisconsin Constitution. To preserve the separation of powers concept upon which our government is based, he asks us to declare the statutes governing the procedure void.

We see no merit in this argument in this case. In prescribing the procedure under which this court may discipline the judges and justices of this state, the legislature was exercising the authority expressly granted it under Art. VII, sec. 11 of the state constitution. Created in April of 1977, with an effective date of August 1, 1978, that section provides:

"**Disciplinary proceedings.** Section 11. Each justice or judge shall be subject to reprimand, censure, suspension, removal for cause or for disability, by the supreme court pursuant to procedures established by the legislature by law. No justice or judge removed for cause shall be eligible for reappointment or temporary service. This section is alternative to, and cumulative with, the methods of removal provided in sections 1 and 13 of this article and section 12 of article XIII."

It is ludicrous to argue, as respondent appears to in his brief, that the legislature's establishment of the pro-

cedures to be used by this court in disciplining members of the judiciary is an unconstitutional exercise of judicial power when the constitution expressly provides that such procedures are to be "established by the legislature by law."

Nor can it be said that the procedure established by the legislature offends any separation-of-powers principle embedded in the constitution. Nothing in the constitution requires that this court have exclusive control over the manner in which members of the judiciary are disciplined and removed from office. In fact, the three alternate methods of removing judicial officers do not involve this court at all. Impeachment under Art. VII, sec. 1, address under Art. VII, sec. 13, and recall under Art. XIII, sec. 12, are all constitutionally authorized methods of removal in which this court has no role. In light of these other procedures, we cannot accept respondent's contention that the procedure provided by secs. 757.81 to 757.99, Stats., insofar as they apply here, is an unconstitutional usurpation of the power of the judiciary.

Respondent next contends that, to the extent the panel considered conduct which occurred prior to the effective date of the constitutional amendment authorizing suspension and removal by this court in making its findings of fact and conclusions of law, it has violated his right to due process under the Fourteenth Amendment to the United States Constitution. Relying on the Supreme Court of Florida's decision in *In re Inquiry Concerning a Judge,* 357 So.2d 172 (Fla. 1978), respondent argues that due process requires notice that an act is a removable offense at the time it is committed. Because this court had disclaimed any authority to suspend or remove judges for misconduct prior to the recent constitutional amendment,[2] respondent argues that he lacked such no-

---

[2] *See In the Matter of the Promulgation of the Code of Judicial Ethics,* 52 Wis.2d vii, ix.

tice before that time and for this reason he cannot be suspended or removed for any conduct alleged to have occurred prior to August 1, 1978.

In effect, respondent is arguing that to apply the constitutional amendment retroactively makes it an *ex post facto* law. He chooses to clothe his argument in due process terms because the prohibitions against *ex post facto* laws in Art. I, sec. 9 of the United States Constitution, and Art. I, sec. 12 of the Wisconsin Constitution have been held to apply only to penal statutes. *See Wisconsin Bingo Sup. & Equip. Co. v. Bingo Control Bd.*, 88 Wis.2d 293, 305, 276 N.W.2d 716 (1979). It is well-established that judicial disciplinary proceedings are not "penal" in character.[3]

Regardless of the form in which it is presented, however, we reject respondent's contention that either the panel or this court is constitutionally forbidden from considering his pre-August 1, 1978, conduct as a basis for recommending or ordering his suspension or removal. In our view respondent had adequate notice both of the wrongfulness of his conduct and of the possible sanctions that could be imposed if it continued.

The Code of Judicial Ethics, which respondent was found to have violated, was adopted by this court effective January 1, 1968.[4] From that time forward respondent had written notice of the conduct that was expected of him as a member of the judiciary.

In 1971, this court adopted rules for the implementation of the Code of Judicial Ethics.[5] These rules created

[3] *In re Nowell*, 293 N.C. 235, 241, 237 S.E.2d 246 (1977); *Sharpe v. State ex rel. Oklahoma Bar Association*, 448 P.2d 301, 305 (Okla. Jud. 1968); *Nicholson v. Judicial Retirement and Removal Comm.*, 562 S.W.2d 306, 308 (Ky. 1978).

[4] *Code of Judicial Ethics*, 36 Wis.2d 252, 153 N.W.2d 873, 155 N.W.2d 565 (1967).

[5] *In the Matter of the Promulgation of the Code of Judicial Ethics, supra*, fn. 2.

a judicial commission similar to the one created by the legislature under sec. 757.83, Stats., and authorized it to receive and investigate complaints of judicial misconduct. Rule 9 specifically provided:

"9. A judge may be removed or suspended from office for:

"(a) Willful violation of a rule of the Code of Judicial Ethics;

"(b) willful and persistent failure to perform his official duties;

"(c) habitual intemperance due to intoxicating beverages or use of dangerous drugs, so as to interfere with the proper performance of his judicial duties;

"(d) conviction of a felony involving moral turpitude."

Although a note to this rule indicated that these sanctions required constitutional authorization, the rule was nevertheless sufficient to inform respondent of the severity with which violations of the Code of Ethics were viewed and of the possible sanction that was felt to be appropriate. *See Dobbert v. Florida,* 432 U.S. 282, 297 (1977).

Even without prior notice of the precise sanction that could be imposed by this court, we would hesitate to hold that due process prevented us from considering respondent's pre-August 1, 1978 conduct in determining whether to suspend or remove him from office. The proceedings here are not criminal proceedings that could result in a fine or imprisonment. Their sole purpose is to protect the integrity of our judicial system, a goal that is essential if the courts of this state are to administer justice with the trust and confidence of the people. To accomplish this end a judge who evidences an unfitness for office may be censured, reprimanded, suspended or removed from office.

In light of the overwhelming importance of the objective judicial disciplinary proceedings are intended to serve, and the non-criminal character of the sanctions

that can be imposed, we do not believe that due process limits our consideration to that conduct occurring after the effective date of the authorizing amendment. Respondent had prior notice of what constituted judicial misconduct from January 1, 1968. In our view, no more was required.

Finally, we note that even if we were to limit our consideration to those facts found by the commission relating to conduct which occurred after the effective date of the constitutional amendment we would still have before us a substantial portion of the conduct which was found by the panel to constitute judicial misconduct. The passage of the constitutional amendment granting this court the power to suspend or remove judges from office had no apparent effect on respondent's conduct. He conducted himself after the effective date of the amendment just as he had before. Clearly, respondent's conduct cannot be explained by a lack of notice.

Respondent's next contention is that sec. 757.87, Stats., which gives to the commission alone the right to request a hearing before a lay jury instead of a judicial conduct panel violates the due process and equal protection guarantees of the Fourteenth Amendment. He concedes that the legislature could constitutionally provide that all judicial disciplinary hearings be held before a three-judge panel, but argues that it may not, consistent with the constitution, afford the commission the right to request a jury while denying that right to the judge whose conduct is to be reviewed. To allow the accuser to select the forum in which the accused is to be tried, respondent contends, is contrary to the concept of fair play implicit in the due process and equal protection clauses of the Fourteenth Amendment.

We disagree. The election granted by the legislature to the commission violates neither due process nor equal

protection. A judge alleged to have engaged in misconduct is entitled under due process to a fair and impartial hearing. But this does not mean that he is entitled to choose the factfinder. So long as the factfinder, whether judicial panel or lay jury, is unbiased, he cannot successfully claim that the use of one or the other violates due process.

Nor does granting such an election to the commission and not to the judge being reviewed constitute a denial of equal protection. The equal protection clause of the Fourteenth Amendment requires "equal protection and security for all under like circumstances in enjoyment of their personal and civil rights." *State Bank of Drummond v. Nuesse*, 13 Wis.2d 74, 83, 108 N.W.2d 283 (1961). Under the judicial disciplinary procedure established by the legislature, respondent is afforded no less protection than any other judicial officer of this state who is alleged to have engaged in judicial misconduct. No judge, appellate or trial, is entitled to a hearing before a lay jury. Sec. 757.87, Stats., provides that the choice between a judicial panel and lay jury lies entirely with the commission.

In this respect judicial disciplinary proceedings are no different than any number of other proceedings in which the initiating party is allowed to make important procedural decisions as to where and how the action will be tried. For example, plaintiffs in sec. 1983 Federal Code actions or federal diversity cases can generally determine whether their action will be heard in federal or state court by where they commence their action. Civil litigants can effectively deny their opponents the opportunity to request a jury by structuring their action in equity rather than law. None of these examples have been thought of as inconsistent with the Equal Protection Clause of the Fourteenth Amendment and we are unwilling to say that the election granted the commission in this instance is violative of that provision either.

The last of respondent's constitutional challenges is to the statutory definition of misconduct contained in sec. 757.81(4)(a), Stats., and Rules 8, 11, 15 and 16 of the Code of Judicial Ethics. He contends that they are unconstitutionally vague and overbroad. Sec. 757.81(4)(a), and the rules incorporated within it, are unconstitutionally vague, respondent contends, because they fail to establish precise standards of behavior to which a judge is expected to conform and thereby deny him adequate notice of what conduct is prohibited. They are overbroad, he contends, because they proscribe speech and conduct protected by the constitution.

There is no dispute between the parties that the vagueness and overbreadth doctrines apply to the judicial conduct regulations at issue here. While these doctrines are generally used to challenge the validity of laws defining criminal conduct, respondent is correct in his assertion that the prohibitions against vagueness and overbreadth extend to regulations affecting conditions of government employment as well as penal statutes. *Broadrick v. Oklahoma,* 413 U.S. 601 (1973); *Bence v. Breier,* 501 F.2d 1185, 1188 (7th Cir. 1974).

However, it would appear from those cases which have addressed the question of unconstitutional vagueness in this context that a greater degree of flexibility and breadth is permitted with respect to judicial disciplinary rules and statutes than is allowed in criminal statutes. Cf. *Parker v. Levy,* 417 U.S. 733 (1974). As the Minnesota Supreme Court noted in *In re Gillard,* 271 N.W.2d 785, 809 (Minn. 1978), "the constitutionality of necessarily broad standards of professional conduct has long been recognized."

Perhaps the most frequently quoted case on this question is *Sarisohn v. Appellate Division, Second Dept., Supreme Ct. of N. Y.,* 265 F. Supp. 454, 458 (E.D.N.Y. 1967). The plaintiff in that case argued that the term

"for cause" in the state constitution and relevant removal statutes was unconstitutionally vague. The federal district court not only rejected this contention but found it too insubstantial to warrant the convening of a three-judge panel to consider it. Conceding initially that the plaintiff's contention had a superficial plausibility, the court rejected it, saying at page 458:

". . . actually the phrase employed is only a practical means of providing flexibility. The words 'for cause' mean for a cause to be enumerated and specified in each particular instance so that the defendant may be duly notified and adequately prepared to defend the charges. It does not mean that a judge may be removed for 'cause' without more and without an enumeration of the charges constituting the alleged 'cause'. It would be impossible to enumerate in any statute all the possible grounds and circumstances justifying the removal of a judicial officer. Guidelines may be found in the Canons of Ethics, applicable to both attorneys and judges, adopted by the American Bar Association and other bar associations, and also in the general moral and ethical standards expected of judicial officers by the community. 'For cause' has been defined in several cases involving the removal of judicial officers and they provide a reasonable person with a competent definition of this phrase. . . ."

Statutes and constitutional provisions which define in similarly broad terms the grounds for removal of judges from office have been upheld in *Napolitano v. Ward*, 317 F. Supp. 79 (N.D. Ill. 1970) ("for cause") ; *Keiser v. Bell*, 331 F. Supp. 608 (E.D. Pa. 1971) ("misconduct in office") ; *Halleck v. Berliner*, 427 F. Supp. 1225 (D.D.C. 1977) ("conduct which is prejudicial to the administration of justice or which brings the judicial office into disrepute") ; *In re Nowell*, 293 N.C. 235, 237 S.E.2d 246 (1977) ("wilful misconduct in office" and "conduct prejudicial to the administration of justice that brings the judicial office into disrepute") ; *Nicholson v. Judicial Retirement and Removal Comm.*, 562 S.W.2d 306 (Ky. 1978) ("for good cause") ; and *In re Gillard*, 271 N.W.2d

785 (Minn. 1978) (persistent failure to perform duties, habitual intemperance or conduct prejudicial to the administration of justice).

In light of these decisions we see no merit in respondent's contention that the statute and rules he was found to have violated are unconstitutionally vague. If the term "cause" is sufficiently definite to withstand a vagueness challenge, there can be no doubt that Rules 8, 11, 15 and 16 of the Code of Judicial Ethics can likewise withstand such a challenge.

The fact that these provisions may not have the preciseness required of laws defining criminal conduct is of no consequence. Respondent has not been charged with engaging in criminal conduct, but with judicial misconduct. His reading of the Code of Judicial Ethics is not as a layman, unfamiliar with the law, but as a judge of twenty years' experience and an attorney of almost twenty more. We think the notice provided by the code is adequate.

Respondent's contention that Rules 8, 11, 15 and 16 of the Code of Judicial Ethics are unconstitutionally overbroad is similarly without merit.

A statute or rule is overbroad when its language, given its normal meaning, is so broad that its sanctions may apply to conduct which the state is not entitled to regulate. *State v. Tronca,* 84 Wis.2d 68, 89, 267 N.W.2d 216 (1978). An overbroad statute or rule is void even though the conduct to which it is presently being applied is not constitutionally protected and would be a proper subject for government regulation or prohibition by a more narrowly drawn law. *Milwaukee v. Wilson,* 96 Wis. 2d 11, 19, 291 N.W.2d 452 (1980).

While we agree with respondent that Rules 8, 11, 15 and 16 may proscribe some speech and conduct which, for other persons in other circumstances, could not be

constitutionally proscribed, we do not accept his contention that they are unconstitutionally overbroad. It is well established "that judges, in company with other public servants, must suffer from time to time such limits on these rights as are appropriate to the exercise in given situations of their official duties or functions." *Matter of Bonin*, 378 N.E.2d 669, 684 (Mass. 1978). *See also In re Rome*, 218 Kan. 198, 205, 542 P.2d 676 (1975) ; *Halleck v. Berliner*, 427 F. Supp. 1225, 1239 (D.D.C. 1977). The limitations imposed by Rules 8, 11, 15 and 16 are all of this kind. They are limitations made necessary by the very nature of the task which a judge seeks to perform. As such they are not improper.

Having disposed of respondent's procedural challenges, we review the panel's findings of fact, conclusions of law and recommendations as to disposition.

As indicated earlier, the panel found that respondent had engaged in misconduct by violating Rules 8, 11, 15, 16 and 17 (e) of the Code of Judicial Ethics. The totality of his misconduct can be divided into three general categories.

The first category involves respondent's acceptance of favorable car rental arrangement from Rank and Son Buick, Inc., a Milwaukee area automobile dealership, over a period of some twelve years. Under this arrangement respondent rented a new automobile each year from Rank and Son which he leased at a monthly charge substantially less than was available to other members of the public. During the years 1975 to 1978, respondent paid a monthly charge of $60 for his use of the automobiles. In 1979 he paid $75 per month. The minimum monthly charge available to others during this period went from $185 in 1975 to $250 in 1979.

In April and May of 1970 two charges were brought against Rank and Son for violations of sec. 218.01 (7a), Stats. 1969, relating to speedometer readings on used

motor vehicles at time of transfer. A violation of sec. 218.01 (7a) is a misdemeanor punishable by a fine of not less than $25 nor more than $100, or imprisonment in the county jail not to exceed ninety days, or both.

Respondent presided over the proceedings. One charge was dismissed because it was undisputed Rank and Son had settled the matter with the complainant. Rank and Son pleaded not guilty as to the second charge, and after trial respondent found the dealership guilty and suspended sentence. This was the same disposition ordered by respondent as to other dealers who appeared before him at this time on similar charges.

The panel found that the favorable rental arrangement provided respondent by Rank and Son constituted a gift and concluded that his acceptance of this gift both during and after Rank and Son appeared before him in an adversary proceeding constituted a violation of Rule 8. His failure to report the gift on the annual financial report filed by members of the judiciary was found to be a violation of Rule 17 (e).

The second category of misconduct respondent was found to have engaged in consists of five separate incidents involving his conduct with women. The panel found that on April 4, 1978, Marilyn Walczak went to respondent's chambers to confer with him in regard to a matter on which she was working in the course of her duties with Wisconsin Correctional Services, a private social service agency. Shortly after she began to explain the purpose of her visit, respondent approached her and put both his arms around her saying, "Let's go have a drink," or "Let's go have dinner." When Ms. Walczak warned respondent that she would yell if he did not allow her to conduct her business, he released her, became stern and short, and told her to tell the clerk to request the court file so the matter could be heard the following morning. Shortly thereafter, as she was talking to the

clerk, respondent entered the room and stated to those present, "Do whatever she asks you to do, she has got the best set of lungs at WCS." Several men present in the room chuckled at respondent's remark. Ms. Walczak was embarrassed and left.

The second incident considered by the panel involved a journalism student, Pamela Thomas, who, upon attending respondent's courtroom, was invited to his chambers where he asked her to lunch. At lunch respondent became aggressive and Ms. Thomas began to feel uncomfortable. Respondent introduced her to several people as his fiancee and told them they were going to Florida together. After lunch Ms. Thomas went with respondent for a drink at the Milwaukee Athletic Club. There respondent became more aggressive, told a few dirty jokes to the bartender, and again introduced her as his fiancee. Respondent told Ms. Thomas he was in love with her and would do anything to have her stay in Milwaukee. He put his arm around her and grabbed her in the chest. He later offered her a necklace, which she accepted, but when he telephoned her on several occasions after this time, Ms. Thomas refused to talk to him.

The third incident followed a wedding performed by respondent in October of 1978. Marilyn Mee, who had attended the wedding, approached respondent to compliment him on his handling of the ceremony. As she extended her hand to shake hands and introduce herself, respondent grabbed her hand and pulled her to him. He put his arm around her and, as his hand reached the side of her breast, he said, "Hey, baby, is all that you?" Respondent then introduced the coatcheck girl to Ms. Mee as his fiancee and stated that they were getting married that night and going to Florida.

The fourth incident considered by the panel occurred at a Milwaukee restaurant in November of 1978. Sheila Plotkin and Anne Lynch were having lunch together when respondent entered and sat down at an adjoining

table. After a short time he approached their table and engaged them in conversation. During the course of this conversation respondent reached behind Ms. Plotkin, grabbed her by the hair and pulled her head back, and then, leaning close to her face, said, "If I had a woman like you at home, I would never leave." After he returned to his table respondent silently mouthed the words "I love you" to Ms. Lynch. He later said to her aloud, "If I was alone I would marry you."

The fifth incident which the panel considered involved Mary Checkvala, a legal secretary in the public defender's office. On an afternoon in January or February of 1979, respondent boarded the shuttle bus on which Ms. Checkvala was riding and sat down in front of her. Respondent began talking with her, asking her name and where she worked. He asked her to work for him and then asked her to marry him. He placed his hand on her while he was talking to her. Ms. Checkvala and respondent both got off the bus at the Milwaukee Safety Building and, after entering the building, boarded an elevator together. On the elevator respondent approached Ms. Checkvala and started kissing her on the face and nibbling on her ear. When she opened her mouth to protest, respondent put his tongue in her mouth.

The panel concluded that respondent's conduct in these incidents consisted of "unprivileged and nonconsensual physical contacts with offensive sexual overtones, the totality of which is gross personal misconduct." By virtue of this conduct respondent was found to have violated Rule 11.

The third general category of misconduct consists of respondent's conduct in the courtroom. The panel found four separate incidents in which respondent commented on the merits of a pending proceeding in violation of Rule 15.

On January 5, 1979, during an initial appearance, respondent stated with respect to the complainant in the

case, "He never makes a mistake." When counsel for defendant stated that reasonable minds could differ, respondent replied, "Yes. And this reasonable mind has been here for 19 years, tells you that Mr. Lewis never makes a mistake." In the course of making the bail determination, respondent stated that $500 is "not adequate bail for a drug peddler." When defense counsel replied, "Alleged drug peddler," respondent said, "No, probable guilt, drug peddler."

On September 28, 1978, respondent asked a defendant during his initial appearance if he had ever been sentenced to jail. When the defendant stated he had not, respondent said, "We are going to try to get you there now."

In October of 1978, during a trial but out of the presence of the jury, respondent stated after being informed that a particular defense witness would be on the stand no more than five minutes:

*"The Court:* But I—you butt into my schedule enough, and I have to meet the Chief right now down at the garage. For what little worth she's going to be, I don't know. The way this case has gone, the evidence now is overwhelming. I see no defense. In fact, we have a judician [sic] confession of a forgery."

Respondent subsequently stated in the absence of the jury:

"I am going to tell you what I feel. I don't think it [the presence of a witness in violation of a sequestration order] is going to make any difference, because I think your man, unless I'm a bad judge of how jury's go—your man is guilty as hell. He is going to get convicted, and I am not going to scratch it."

Respondent also stated outside the presence of the jury, referring to the defendant:

"This man committed a crime, and he admitted to it in my presence, and I don't even know why, on the theory

of the law that I believe in, he shouldn't even go to a jury. I should have a directed verdict here.

". . .

"Unfortunately, that's not the law."

On November 12, 1976, after having mistakenly commented on the evidence while instructing the jury, respondent granted defense counsel's motion for a mistrial. When the jury was subsequently returned he stated:

"Ladies and gentlemen of the jury, I don't know why you didn't come back with a verdict five minutes after you went back. The lawyer thinks I have made a mistake in commenting on the law and he asked for a mistrial and I granted it. I believe you had enough facts to come back here at the end of five minutes. Now this trial is going to have to be conducted again, but fortunately I can comment now because you are not going to be handling it and there is no jury panel you are going to be affected with. I don't know what the delay was for four hours but this was a clear-cut case and you are excused with thanks for the services you have given Milwaukee for the last four weeks."

Also as part of this third category, the panel found twenty-seven separate incidents in which respondent had failed to comply with one or more of the standards of judicial conduct set forth in the code. Rather than describe each of these instances in detail, we have chosen to set forth a few representative examples of the kind of conduct found by the panel to constitute noncompliance with the judicial conduct standards.

On February 12, 1979, at a hearing on a motion to suppress evidence obtained by a search made pursuant to a warrant, the following colloquy took place between respondent and defense counsel:

"*The Court:* I think Mr. Seeger, Mr. Martinez, could have made a better record than he did as far as Mr. Donovan's activities, but I think there was probable cause

here to search the car, and the motion to suppress the search warrant is denied.

*"Mr. Martinez:* Your Honor, on your findings of fact and conclusions of law, what do you find to be the crime committed? What evidence do you find, the crime committed—

*"The Court:* Here is a man who is known to Mr. Kassuba as a man who steals from parking meters. He saw the man going from parking meter to parking meter and opening his car. He doesn't actually have to see the actual transfer of the money. Okay.

*"Mr. Martinez:* What money was removed.

*"The Court:* I am not answering your questions. I just suppressed—

*"Mr. Martinez:* Well, Judge—

*"The Court:* I mean, I denied your motion to suppress. Don't judge me. We're going to move here on this case now.

*"Mr. Martinez:* Judge, I am—

*"The Court:* Let me finish.

*"Mr. Martinez:* Yes, sir.

*"The Court:* Don't interrupt me.

*"Mr. Martinez:* Okay.

*"The Court:* All this Court is interested in, Mr. Martinez, is a search for truth. Now, let us proceed with the next motion.

*"Mr. Martinez:* Judge, then I like to make the record clear that I am entitled to have findings of facts, conclusions of law.

*"The Court:* You got your findings of fact right here.

*"Mr. Martinez:* I'm asking—

*"The Court:* There was enough in this transcript, testimony of the officer and the testimony of Mr. Kassuba, as to the activities of Mr. Donovan on this particular day, and the knowledge of this officer of Mr. Donovan and the knowledge of Mr. Kassuba of Mr. Donovan. Now, you have them, sir. Now, the next motion.

*"Mr. Martinez:* Well, I'm asking you for findings of fact as to what observations of what kind were made.

*"The Court:* Now, if you'll open your mouth once more, I'm going to have you in the pokey with your client, sir. I just got through making the findings. Now, I am not going to make any further. If you think that that's not sufficient, it's the best thing that can happen to you. I think it is sufficient.

"Now, what's your next motion? I'm going to make short work of you today, Mr. Martinez. I assure you.

*"Mr. Martinez:* Exactly what is the definition of short work, Your Honor?

*"The Court:* We're going to proceed with this trial, and if you continue to question me, sir, I'm going to have you—hold you in contempt. I have to do this, to warn you, and I am warning you. We're now at 10:00 o'clock, and this case hasn't even begun yet. I don't like the way you conduct yourself, and I'm going to make short work of you.

*"Mr. Martinez:* Exactly—exactly what did you—

*"The Court:* I am going to move this trial. Exactly what it means. Now, if you open up your mouth once more, sir, except to move this trial, I'm going to hold you in contempt.

*"Mr. Martinez:* Moving right along, Your Honor—

*"The Court:* All right. Next motion."

On October 19, 1978, during a contempt hearing involving an attorney who had arrived one hour and fifty minutes late for the second day of a jury trial because of his appearance before a municipal committee in City Hall, respondent stated, "I take priority over every S.O.B. in the City Hall, including the mayor."

At a hearing before respondent on January 26, 1979, to determine whether a defendant should be returned to the hospital for violating the conditions of his release, respondent stated:

"We've got to get these damn psychiatrists out of the courtroom. Men ought to be punished for their crimes. If they need help, mentally, send them to the mental institution, then off to prison to finish their sentence, to be punished for their crimes, and I'm saying—serving notice now and to the liberal members of the State Supreme Court, they better change because I'll be around longer than they will, and I am putting that in the record. Oh, I know the members of the Court of Appeals already know this, so I don't have to give them warning."

During a trial in October of 1978, respondent instructed a district attorney to reword a jury instruction which

the district attorney had conceded was proper. Respondent said to the district attorney:

"Will you sit down with him and word this one since you think he has a right to it, and I have yet to give a defendant's theory in 500 jury trials that this Court has tried in 20 years. I have yet to give a defendant's theory. This is the first time I heard a district attorney tell me that's the law, and if it is, if it is, you word it how I should give it."

In late 1969 or early 1970, Attorney James Shellow was waiting in respondent's courtroom while respondent was handling another case. Respondent stated in open court that he did not believe the defendant before him, just as he did not believe Attorney Shellow's clients. He stated that the defendant was guilty and was not telling the truth just as Attorney Shellow's clients are guilty and do not tell the truth.

On November 12, 1976, after granting a mistrial requested by defense counsel after the jury had already begun its deliberations, respondent said to defense counsel, "You don't want truth here. You want to win this on a technicality and I despise you for it." Bail was originally set for the defendant in the case at $2,000 with sureties or ten percent in cash. Respondent raised bail to $5,000 after granting the mistrial out of anger at defense counsel.

On October 3, 1974, after imposing sentence on a defendant, respondent stated: "That's a very light sentence, but when you get out of Green Bay, sir, I suggest you get out of this town and go back to Puerto Rico. Do you understand? . . . . Because you can't make it in a civilized community. All right."

On July 6, 1978, at a hearing on a motion to reduce sentence and for a new trial, respondent said:

"You want your cake and eat it too, but you are not going to get it. I never make errors. The only ones that make errors are the ones that reverse me, see. I'm not

going to give you any consideration. This man was as guilty as hell. Your brief is here, you want to reply to his brief, Mr. Nelson? I'm going to make short shrift of this one. This man should have got a hundred years, a la Texas style."

The panel concluded that respondent exhibited in these instances and numerous others included in its report an aggravated and persistent failure to comply with the standards of judicial conduct set forth in the code. As such, his conduct was found to be a violation of Rule 16.

Sec. 757.91, Stats., provides that the rules applicable to civil proceedings are to govern our review of judicial disciplinary proceedings. Thus, we must accept the panel's findings unless they are against the great weight and clear preponderance of the evidence. *Metropolitan Sewerage Comm. v. R. W. Const.*, 72 Wis.2d 365, 373, 241 N.W.2d 371 (1976).

Although respondent by no means accepts all of the specific facts found by the panel, his primary challenge is to the conclusions of the panel which are based on those facts. He claims that the facts found by the panel do not constitute wilful violations of the Code of Judicial Ethics.

We disagree. The facts found by the panel are not against the great weight and clear preponderance of the evidence and its conclusions that these facts constitute violations of the Code of Judicial Ethics are not incorrect.

Respondent's acceptance of the favorable automobile rental arrangement from Rank and Son during and after he had presided over a case in which the auto dealer was a party does constitute a violation of Rule 8. The rule clearly and unequivocally prohibits a judge from accepting gifts from anyone "whose interests are, are likely to be, or have been before him in his official capacity." Its violation does not require proof that the gift

was accepted with "strings attached." Rule 8 goes beyond prohibiting a judge from accepting a "bribe." It prohibits judges from accepting gifts under circumstances which may give the appearance of impropriety. Respondent's acceptance of Rank and Son's automobiles at substantially reduced rates both during and after he had presided over an action to which it was a party gave that appearance. It is therefore a violation.

Respondent's conduct toward the women in the five incidents described by the panel also constitutes a violation of the Code of Judicial Ethics. While certain of the incidents, viewed individually may not amount to what can be considered gross personal misconduct, taken as a whole respondent's conduct does constitute a violation of Rule 11. It is significant that the panel found respondent's conduct toward each of these women to be wholly unsolicited. All but one of the women were complete strangers to him. Furthermore, not only did the women find respondent's conduct offensive and embarrassing, but several testified that they were particularly appalled by the fact that a member of the judiciary would act in such a way.

A judge must be aware of the public trust that is placed in him and he must so conduct himself, both publicly and privately, so as to maintain that trust and confidence. "When a judge, either in his official capacity or as a private citizen, is guilty of such conduct as to cause others to question his character and morals, the people not only lose respect for him as a man but lose respect for the court over which he presides as well." *State v. O'Hara,* 252 La. 539, 559, 211 S.2d 641 (1968).

Respondent's conduct, as found by the panel, clearly gave cause to question his character. Taken in its totality, it constitutes gross personal misconduct in violation of Rule 11.

The panel's conclusions that respondent by his conduct in the courtroom had violated Rules 15 and 16 of the

Code of Judicial Ethics are also properly drawn from facts which are not against the great weight and clear preponderance of the evidence.

The four instances found by the panel in which respondent commented on the merits of pending proceedings and openly expressed his opinion as to the guilt of a defendant cannot be contested. Like almost all of the courtroom conduct considered by the panel, they appear in the transcript of the proceedings. Moreover, these instances clearly constitute violations of Rule 15.

Contrary to respondent's reading of that rule, it does not merely proscribe judicial comment in the presence of the jury such as to actually affect the outcome of the proceeding. It proscribes all judicial comment on pending proceedings, whether or not it can be shown to have affected the outcome. The rule is designed to insure and inspire the impartiality of judges as well as juries. Both are necessary if our system of justice is to have the trust and confidence of the people that it serves.

Respondent's persistent and aggravated failure to comply with the standards of the code in violation of Rule 16 is similarly apparent from the transcripts of the proceedings over which he presided. His berating and disparagement of defense counsel and defendants, his use of bail as an instrument of retaliation, his disrespect for other trial and appellate courts, his refusal to listen to defense arguments and to allow counsel to make offers of proof, and his aligning of himself with the prosecution all illustrate a temperament unsuited for judicial office. It is conduct wholly at odds with the standards for judicial conduct set forth in the Code of Judicial Ethics.

We cannot accept the argument put forth by respondent that this court has implicitly condoned his courtroom conduct by its failure in the more than 100 cases that have been appealed from his court to reverse on grounds of judicial misconduct or to publicly reprimand him. This argument is based on a misunderstanding of the

function of appellate review. As the Supreme Court of Michigan stated in *In the Matter of Laster,* 404 Mich. 449, 462, 274 N.W.2d 742 (1979):

"Judicial conduct creating the need for disciplinary action can grow from the same root as judicial conduct creating potential appellate review, but one does not necessarily exclude the other. One path seeks to correct past prejudice to a particular party; the other seeks to prevent potential prejudice to future litigants and the judiciary in general."

The fact that none of the cases over which respondent presided were reversed by this court because of judicial misconduct does not mean that no misconduct occurred or that this court condoned that which did occur. It means only that this court found no judicial misconduct that had so seriously affected the trial as to warrant reversal.

For this reason respondent's record on appeal is of little significance in determining whether he has engaged in judicial misconduct. The panel concluded that he had in fact engaged in misconduct by violating the Code of Judicial Ethics and, as we have already indicated, its conclusions were properly drawn from facts sufficiently supported by the evidence. All that remains then is the determination of the appropriate discipline.

While we regard all of the violations found by the panel as significant and worthy of discipline, it is the conduct found by the panel to constitute violations of Rules 15 and 16 that we view as most serious. A reading of the transcripts of those proceedings presided over by respondent and compiled by the commission demonstrate a lack of judicial temperament that cannot go unnoticed.

We are not unaware that throughout his twenty years as a judge respondent has heard thousands of cases. He has been diligent and industrious and has facilitated the disposition of pending cases more efficiently than most judges. We are also aware that both the sheer volume

and the type of cases respondent has heard can lead to the kind of exasperation and impatience he has shown. Be that as it may, the conduct of those who aspire to be judges, both off the bench but particularly on the bench, must be such as to warrant the respect of the public and the confidence of litigants that they will be treated fairly, impartially and considerately. In this respect, respondent has failed. The nature and frequency of his violations of the rules and noncompliance with the standards of the Code of Judicial Ethics are such that they cannot be overlooked or treated lightly.

In judicial discipline proceedings this court is empowered to censure or reprimand the offending judge. The court is further empowered to remove the judge from his judicial office or suspend him with or without pay.

In this proceeding the panel recommended removal or, in the alternative, suspension without pay for a period of three years. While this court is not bound by the recommendations of the panel, those recommendations are entitled to some deference.

The panel concluded the violations of the Code of Judicial Ethics, taken as a whole, were serious and repetitive indicating a persistent disregard of the required standards of judicial conduct. Standing alone any one of the violations, or even perhaps several, would not warrant suspension or removal. Censure or reprimand would be appropriate. However, taken as a whole they demonstrate a present unfitness to serve as a judge.

Suspension and removal, to be sure, are drastic measures. The respondent's ethical violations are serious, however we do not believe they have reached the plateau that requires removal. He was not charged with any serious violation of the criminal law nor any corrupt conduct in office.

There is nothing in the record before us to indicate that the respondent does not have the potential capability

to conduct himself within the requirements of proper judicial ethics.

In balancing the scales we conclude the proper disposition is a suspension from judicial office for a period of three years without pay.

It is Adjudged the respondent's conduct merits discipline. The respondent is hereby suspended from the office of circuit judge without compensation and prohibited from exercising any of the powers or duties of a circuit judge in the State of Wisconsin for a period of three years from this date.

ABRAHAMSON and COFFEY, JJ., took no part.