**2026 WI 18**

# Supreme Court of Wisconsin



IN THE MATTER OF DISCIPLINARY PROCEEDINGS AGAINST
GARY W. THOMPSON, ATTORNEY AT LAW

OFFICE OF LAWYER REGULATION,
*Complainant-Respondent,*

*v.*

GARY W. THOMPSON,
*Respondent-Appellant.*

No. 2024AP1019-D
Decided June 1, 2026

ATTORNEY DISCIPLINARY PROCEEDING

¶1    PER CURIAM.   This disciplinary matter comes to the court on Attorney Gary W. Thompson's appeal of a report and recommendation of Referee James J. Winiarski. After holding an evidentiary hearing, the referee concluded that the Office of Lawyer Regulation (OLR) had proven the single count of misconduct asserted in its complaint; namely, that Attorney Thompson violated Supreme Court Rule (SCR) 20:3.4(b) by offering an inducement to a fact witness that is prohibited by law.[1] As a sanction, the referee recommended that the court publicly reprimand Attorney

---

[1] SCR 20:3.4(b) states that an attorney shall not "falsify evidence, counsel or assist a witness to testify falsely, or offer an inducement to a witness that is prohibited by law[.]"

Thompson and order him to pay the full costs of this disciplinary matter. Restitution is not at issue.

¶2     Attorney Thompson has appealed the referee's report and recommendation. In his briefing and oral argument in this court, Attorney Thompson has offered three arguments: first, that SCR 20:3.4(b) is unconstitutionally vague as applied to his conduct in the case at bar; second, that if the rule is not unconstitutionally vague, his conduct did not violate it; and third, that if his conduct did violate the rule, the appropriate discipline should be only a private reprimand, with a significant reduction in costs.

¶3     After reviewing this matter and considering Attorney Thompson's appeal, we accept the referee's factual findings, we reject Attorney Thompson's appellate arguments, and we agree with the referee that Attorney Thompson committed the charged violation. We further agree with the referee that Attorney Thompson's misconduct warrants a public reprimand. We impose full costs.

¶4     The following facts are undisputed. Attorney Thompson was admitted to practice law in Wisconsin in May 1988 and practices in Milwaukee, Wisconsin. He has no disciplinary history.

¶5     This disciplinary proceeding against Attorney Thompson stems from litigation regarding a commercial construction project in Milwaukee. The general contractor on the project hired a subcontractor to provide various construction services. The subcontractor's work was consistently behind schedule. In August 2018, the general contractor terminated the subcontractor before the project was completed, citing the subcontractor's failure to remain on schedule, among other issues.

¶6     After the subcontractor's termination from the project, the subcontractor's owner, I.G., told the employee who had managed the project, J.T., that he could remain employed with the company only if he took a 50% pay cut. J.T. declined, and his employment with the company ended. J.T. testified without refutation at the disciplinary hearing that he was later deemed eligible for unemployment benefits over the company's opposition.

¶7     In February 2021, the subcontractor, represented by Attorney Thompson, sued the general contractor in circuit court, raising claims of

unjust enrichment, breach of contract, and others. Several months later, the circuit court entered a stipulated order referring the dispute to arbitration.

¶8      As the arbitration hearing neared, Attorney Thompson called J.T. and asked if J.T. could review documents regarding the project in question, help with Attorney Thompson's case preparation, and likely serve as an arbitration witness. Attorney Thompson knew that, as the person who managed the project in question, J.T. would be the most knowledgeable person regarding the project and would be an important witness.

¶9      J.T. did not commit to helping Attorney Thompson during their phone conversation. Attorney Thompson eventually sent J.T. a follow-up text stating that "[s]hould [his client] prevail in litigation, you would be entitled to $25,000." Attorney Thompson's text also stated that "[c]onsidering this litigation will necessitate some phone conversations with me to bring me up to speed, review of emails, you potentially sitting for a deposition/hearing before the arbitrator, [the client] will pay you $2,000 for your time in this regard."

¶10     J.T. did not respond to Attorney Thompson's text. Attorney Thompson later called him and said that his client was offering $5,000 (as opposed to the $2,000 initially offered) for the time it would take to assist in the arbitration matter. Again, J.T. did not commit to providing assistance.

¶11     According to the testimony at the evidentiary hearing before the referee, Attorney Thompson obtained these dollar figures—$2,000, $5,000, and $25,000—from I.G., his client's owner. I.G. testified at the evidentiary hearing that "the first amount just was a—just an amount that I just threw at [J.T.], just thought that would have been enough." I.G. further testified that he arrived at the $5,000 figure by asking a hiring agency for the weekly market rate for a project manager, dividing that number by 40 to derive an hourly rate, and then multiplying that rate by the number of hours he thought J.T. would need to spend on the case. Finally, I.G. testified that he based the $25,000 figure on J.T.'s 2017 employment agreement with the company. This agreement stated in pertinent part:

> Owner agrees to pay Project Manager a yearly salary of $50,000 with all prevision [sic] allowed by the state, in addition, owner agrees to pay a 5% bonus to Project Manager per each project signed. This bonus will apply under certain

conditions that must be met at each project. *[J.T.] agrees that to receive the so called "bonus" he must complete the project within schedule and budget,* that all schedules must be drafted in accordance with timetable which will be set by [J.T.] and approved by owner, that all budgets must be based on true numbers and contingency allowance will only apply if approved by owner. Manager shall keep track of, and account to Owner for, the number of hours which he works directly for the Project.

(Emphasis added).

¶12 Before Attorney Thompson contacted J.T. for help with the arbitration matter, he had reviewed this employment agreement and told I.G. that, in his view, J.T. was entitled to his "5% bonus" under the agreement for his work on the project in question—even though the company had been terminated from the project for failing to meet deadlines, even though J.T.'s employment with the company ended shortly thereafter, and even though the project was not "complete[d] . . . within schedule and budget," as the bonus provision required.

¶13 If, hypothetically, J.T. had been entitled to the 5% bonus for his work on the project, the bonus figure could not be calculated by reference to the terms of the agreement, as they did not identify the amount against which the percentage calculation was to be made. There was no past practice to help answer this question, as J.T. had never before received a bonus from the company. I.G. arrived at a bonus figure by applying 5% to the roughly $500,000 value of the company's completed work on the project as of the date the company was terminated, for a bonus total of $25,000. Attorney Thompson testified at the disciplinary hearing that this $25,000 figure "sounded about right. I didn't write any calculations down, I relied on [I.G.] to do what he always has done, putting numbers together in other litigation we worked on together . . . ." Attorney Thompson therefore reasoned that if his client won damages at arbitration, up to $25,000 of those funds would belong to J.T. as his bonus; hence his text promising J.T. that if his client "prevail[ed] in litigation," J.T. "would be entitled to $25,000." *See supra* ¶9.

¶14 According to Attorney Thompson's testimony at the disciplinary hearing, elicited by unobjected-to questioning from the referee, his opposing counsel in the arbitration matter learned of his payment offers

4

to J.T. and moved for sanctions, claiming the offers constituted an attempt to bribe an important witness. The arbitrator granted the motion and dismissed Attorney Thompson's client's arbitration claims.

¶15    In its complaint against Attorney Thompson, the OLR alleged a single count of misconduct under SCR 20:3.4(b) and sought a public reprimand. Attorney Thompson filed an answer in which he denied committing any misconduct. Attorney Thompson later moved to dismiss the OLR's complaint on various grounds.  After briefing and argument, the referee denied Attorney Thompson's motion to dismiss.

¶16    The case proceeded to an evidentiary hearing, at which Attorney Thompson, J.T., and I.G. testified.

¶17    The referee later filed a brief report. Regarding Attorney Thompson's claim that his $25,000 contingent offer to J.T. was not improper because it represented a bonus owed under J.T.'s 2017 employment agreement with his client, the referee determined that the employment agreement had been "terminated" in August 2018 and that the project in question had not been completed "within schedule and budget," as the bonus provision in the agreement required. The referee further wrote that Attorney Thompson's claimed need for help in going through the evidence to prepare for arbitration "was no justification for offering improper financial incentives to [J.T.]." The referee continued:

> Thompson could have retained other individuals to help him prepare for the arbitration hearing. . . . [O]ffering financial incentives to an important witness who was probably the most knowledgeable individual as to what had occurred in the construction dispute, was inappropriate. Further, telling [J.T.] he may be entitled to a potential bonus, if the case was won by [Attorney Thompson's client], was most inappropriate. Essentially, it was an offer to give a financial award to [J.T.] if [Attorney Thompson's client] was successful, with [J.T.'s] help at the hearing.

¶18    The referee recommended that Attorney Thompson be publicly reprimanded for his misconduct. The referee expressed concern that Attorney Thompson "still does not recognize the impropriety of his offers to [J.T.]." The referee deemed it "important that other lawyers and the public know such conduct is most inappropriate."

5

¶19     The referee also recommended that the court impose full costs on Attorney Thompson. As of April 15, 2026, the costs total $23,209.42.

¶20     Attorney Thompson appealed the referee's report. The parties' appellate briefing is complete, and the court held oral argument in this matter on March 11, 2026. The matter is now ripe for decision.

¶21     In reviewing the referee's report, we will affirm the referee's findings of fact unless they are clearly erroneous. We review conclusions of law de novo. *See In re Disciplinary Proceedings Against Eisenberg*, 2004 WI 14, ¶5, 269 Wis. 2d 43, 675 N.W.2d 747. We may impose whatever sanction we see fit, regardless of the referee's recommendation. *See In re Disciplinary Proceedings Against Widule*, 2003 WI 34, ¶44, 261 Wis. 2d 45, 660 N.W.2d 686.

¶22     There is no showing that any of the referee's findings of fact are clearly erroneous. Accordingly, we adopt them.

¶23     We also agree with the referee's legal conclusion that Attorney Thompson violated SCR 20:3.4(b). As noted above, Attorney Thompson challenges this conclusion on the grounds that SCR 20:3.4(b) is unconstitutionally vague as applied to his conduct in the case at bar, and even if not, his conduct did not violate the rule. We are not persuaded.

¶24     "The concept of vagueness rests on the constitutional principle that procedural due process requires fair notice and proper standards for adjudication." *State ex rel. Hennekens v. City of River Falls Police & Fire Comm'n*, 124 Wis. 2d 413, 420, 369 N.W.2d 670 (1985). A responding lawyer is entitled to due process in a disciplinary proceeding, *In re Disciplinary Proceedings Against Gamino*, 2005 WI 168, ¶48, 286 Wis. 2d 558, 707 N.W.2d 132, and we have recognized that our disciplinary rules are subject to due process scrutiny for vagueness. *See, e.g., In re Disciplinary Proceedings Against Hupy*, 2011 WI 38, ¶91, 333 Wis. 2d 612, 799 N.W.2d 732.

¶25     We apply a less stringent vagueness standard to ethical rules than we apply to criminal statutes. *See id.* This is partially due to the recognition that our ethical rules cannot possibly contain enough prohibitions and prescriptions to cover every ethical dilemma a lawyer might face in the practice of law. *See generally Matter of Rabideau*, 102 Wis. 2d 16, 25, 306 N.W.2d 1 (1981) (stating that, with respect to a particular ethical rule, a "fixed list" of prohibited behavior "would likely, as applied to particular situations, be both over- and underinclusive"); *see also Matter of*

*Seraphim*, 97 Wis. 2d 485, 497, 294 N.W.2d 485 (1980) (stating that "'the constitutionality of necessarily broad standards of professional conduct has long been recognized'")(citation omitted). In addition, while the test for vagueness in a criminal statute asks whether it "'define[s] the criminal offense with sufficient definiteness that *ordinary people* can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement,'"[2] we use a different measuring stick when evaluating ethical rules for vagueness. Instead of an "ordinary person" standard, we use what might be called a "reasonable lawyer" standard, requiring that the lawyer's specialized professional training and knowledge be considered in determining whether an ethical rule is unconstitutionally vague. *See In re Disciplinary Proceedings Against Beaver*, 181 Wis. 2d 12, 24, 510 N.W.2d 129 (1994) (concluding that an ethical rule was not unconstitutionally vague because its prohibition was "understandable by a person who has been licensed as an officer of the court," keeping in mind "[t]he context in which [the] provision is promulgated and the cases to which it has been applied"); *see also Matter of Rabideau*, 102 Wis. 2d at 24 (rejecting vagueness challenge to an ethical rule prohibiting illegal conduct involving moral turpitude; citing "the heightened awareness of the law and heightened responsibility to respect it with which an attorney is properly charged," and the fact that "[a] responsible attorney should have no cognitive problem" tailoring his or her behavior to comply with the rule).[3]

---

[2] *State v. Grandberry*, 2018 WI 29, ¶33, 380 Wis. 2d 541, 910 N.W.2d 214 (emphasis added) (citation omitted).

[3] When evaluating vagueness challenges to lawyers' ethics rules, many other courts apply a standard that reflects the discrete group of individuals being regulated—lawyers. *See, e.g., People v. Morley*, 725 P.2d 510, 516 (Colo. 1986) ("Since a disciplinary rule is promulgated for the purpose of guiding lawyers in their professional conduct, and is not directed to the public at large, the central consideration in resolving a vagueness challenge should be whether the nature of the proscribed conduct encompassed by the rule is readily understandable to a licensed lawyer"); *In re Crossen*, 880 N.E.2d 352, 379 n.45 (Mass. 2008); *State ex rel. Nebraska State Bar Ass'n v. Kirshen*, 441 N.W.2d 161, 168 (Neb. 1989); *In re Holtzman*, 577 N.E.2d 30, 33 (N.Y. 1991); *Comm'n for Law. Discipline v. Benton*, 980 S.W.2d 425, 437 (Tex. 1998) ("Because we are concerned with whether an enactment gives fair notice to those to whom [it] is directed, in scrutinizing a disciplinary rule directed solely at lawyers we ask whether the ordinary lawyer, with the benefit of guidance

¶26     Applying these principles to SCR 20:3.4(b), we conclude that the rule was adequate to inform Attorney Thompson and other licensed lawyers that the conduct he engaged in was prohibited. As stated above (*see* n.1), this rule forbids a lawyer from "offer[ing] an inducement to a witness that is prohibited by law." Comment [3] to this rule explains that although "it is not improper to pay a witness's expenses," "[t]he common-law rule in most jurisdictions is that it is improper to pay an occurrence witness any fee for testifying."

¶27     This language—both in the rule and in the accompanying comment—is hardly unique to the state of Wisconsin. It tracks, word-for-word, the American Bar Association's (ABA) Model Rule 3.4(b) and its accompanying Comment [3]. Despite the fact that ABA Model Rule 3.4(b) has been largely adopted in most jurisdictions, Attorney Thompson cites no court that has deemed its language unconstitutionally vague, and we are aware of none. We will not be the first.

¶28     We begin by analyzing Attorney Thompson's $25,000 offer to J.T., conditioned on his client's victory at arbitration. We have long prohibited such an offer to a witness. *See generally Miller v. Anderson*, 183 Wis. 163, 168, 196 N.W. 869 (1924) (stating that "[c]ontracts to pay for collecting and procuring testimony to be used in evidence, coupled with a condition that the contractee's right to compensation depends upon the character of the testimony procured, or upon the result of the suit in which it is to be used, have been uniformly condemned by the courts as contrary to public policy, for the reason that such agreements hold out an inducement to commit fraud or procure persons to commit perjury"), citing *Manufacturers' & Merchants' Inspection Bureau v. Everwear Hosiery Co.*, 152 Wis. 73 (1912) (collecting cases). Any reasonable lawyer reading the text of SCR 20:3.4(b) in conjunction with this precedent would readily understand that Attorney Thompson's contingent $25,000 offer to J.T. was prohibited.

¶29     To be sure, Attorney Thompson has proffered an innocent explanation for this $25,000 offer—he claims it was the amount legally owed to J.T. as a bonus under his 2017 employment contract. But the referee heard this explanation and essentially deemed it factually and legally

---

provided by case law, court rules and the 'lore of the profession,' could understand and comply with it.")(internal quotation marks and citations omitted).

incredible. After noting that J.T.'s employment agreement "had been terminated in August 2018" and that the triggering condition for the bonus—the completion of the project in question "within schedule and budget"—had never occurred, the referee labeled Attorney Thompson's contingent $25,000 offer "most inappropriate," as it amounted to "an offer to give a financial award to [J.T.] if [his client] was successful, with [J.T.'s] help at the hearing." Attorney Thompson does not present a developed argument challenging the numerous questions of law and fact (including determinations of witness credibility) underlying the referee's reasoning. We see no basis for upsetting it.

¶30    We turn next to Attorney Thompson's offers of $2,000 and $5,000 to J.T. for the anticipated time required to prepare for and testify at the arbitration hearing. As stated above, Comment [3] to both SCR 20:3.4(b) and ABA Model Rule 3.4(b) explains that "it is not improper to pay a witness's expenses," but "[t]he common-law rule in most jurisdictions is that it is improper to pay an occurrence witness any fee for testifying."

¶31    Any reasonable lawyer, with the benefit of this language and the guidance provided by bar association ethics opinions that have interpreted it, would understand that a fact witness may be compensated only for particular losses incurred by the witness in preparing to testify and testifying. *See* State Bar of Wis. Comm. on Pro. Ethics, Formal Op. No. E-88-9 (1988) (explaining that "inducements to witnesses that exceed their actual out-of-pocket losses would support findings of SCR 20:3.4(b) violations"); Wis. Ethics, Formal Op. E-89-17 (1989) (explaining that a fact witness may be compensated for time lost in preparing to testify and testifying, so long as the compensation is reasonable and not otherwise prohibited by law); ABA Comm. on Ethics & Pro. Resp., Formal Op. 96-402 (1996) (explaining that, under ABA Model Rule 3.4(b), a fact witness may be compensated for expenses incurred and time lost in preparing to testify and testifying, as long as the compensation is "reasonable, so as to avoid affecting, even unintentionally, the content of a witness's testimony"). Payments to a fact witness that are not tied to particular losses incurred by the witness—i.e., payments that are out of proportion to expenses, or to the time required of the witness for the matter, or to a reasonable hourly rate for the witness— all carry the unacceptable risk of influencing the witness's testimony, and are therefore prohibited.

¶32    Measured against this standard, Attorney Thompson's $2,000 and $5,000 offers to J.T. were unethical. These amounts were not tied to any

particular loss by J.T. They were, instead, forward-looking estimates by a non-lawyer (I.G.) as to how much time J.T. might need to spend preparing for and testifying at an arbitration hearing, and what J.T.'s current hourly wage rate at a hypothetical employer might be. For his part, Attorney Thompson served merely as a conduit for transmitting these figures to J.T., not as professional check on their reasonableness. Tellingly, J.T. testified that he never had a discussion with Attorney Thompson as to how either figure was derived, and that he thought both figures seemed "excessive" for what he was being asked to do. In light of the above, we have no difficulty agreeing with the referee's determination that in making these offers, Attorney Thompson was extending "improper financial incentives" for testifying, forbidden by SCR 20:3.4(b).

¶33     We note that throughout this case, Attorney Thompson has insisted that he didn't understand SCR 20:3.4(b) to prohibit his actions here; that he sincerely believed that J.T. was legally entitled to a bonus under the 2017 employment agreement; and that he acted in good faith and without intent to affect the substance of any testimony by J.T. Assuming for the sake of argument these assertions are true, they do not establish a defense to the ethical violation that the OLR has charged. There is no good-faith exception to the rule's prohibition on offering witness-influencing payments, and this court has been unpersuaded by lawyers' claims that they should not be disciplined because they did not believe their actions were unethical. *See In re Disciplinary Proceedings Against Siderits*, 2013 WI 2, ¶29, 345 Wis. 2d 89, 824 N.W.2d 812 ("To allow an ignorance-of-the-law excuse in lawyer ethics cases would encourage and reward indifference to the ethics code and the cases interpreting it, a pernicious outcome.")

¶34     As for the appropriate amount of discipline to impose, we conclude that a public reprimand, as the OLR and the referee recommend, represents a reasonable middle ground between possible outcomes. On one end of the spectrum, a private reprimand, which Attorney Thompson seeks, would be appropriate if "the degree of injury or potential injury [were] little or none." *See* ABA Annotated Standards for Imposing Lawyer Sanctions (ABA Standards), Standard 2.6, Annotation at 85 (2d ed. 2019). That is not the case here, given Attorney Thompson's testimony at the disciplinary hearing that his conduct led the arbitrator to dismiss his client's arbitration claims. Moreover, we believe that Attorney Thompson's discipline should be made public to help deter other lawyers from engaging in similar misconduct, particularly to the extent that Attorney Thompson's claimed uncertainty about the meaning of SCR 20:3.4(b) is shared by other lawyers.

¶35    However, imposing more than a public reprimand (i.e., a suspension of some length) seems undue. We note that only one count of misconduct is at issue, Attorney Thompson has not previously been disciplined over his 38-year legal career, and he has cooperated with the disciplinary process. *See generally* ABA Standard 9.32 (listing mitigating factors for consideration). We trust, too, that a suspension is not needed to impress upon Attorney Thompson both the fact and the severity of his misconduct. A public reprimand will suffice.

¶36    Regarding costs, we note they are considerable for a matter involving only one count of misconduct—again, $23,209.42 as of April 15, 2026. This large figure is a reflection of the fact that Attorney Thompson has litigated this case to the hilt—he unsuccessfully moved to dismiss the OLR complaint; he engaged in extensive discovery, including (according to the OLR) propounding interrogatories and requests to produce documents and taking multiple depositions; and he has now litigated this case here through briefing and oral argument. Attorney Thompson certainly had the right to litigate the case so vigorously, "[b]ut SCR 22.24(1m) makes clear that when a lawyer ultimately found guilty of misconduct imposes costs on the disciplinary system, he or she must expect to pay them." *In re Disciplinary Proceedings Against Ritland*, 2021 WI 36, ¶43, 396 Wis. 2d 509, 957 N.W.2d 540.

¶37    Attorney Thompson nevertheless claims that he is entitled to a reduction in costs because he has already "spent substantial time (the Complaint in this matter was filed May 23, 2024) and money seeking . . . clarity" as to what SCR 20:3.4(b) means, and he suggests that "this case be viewed as instructive to the Bar rather than punitive to him." He further submits that he should not have to pay full costs because "[i]f the OLR had offered a private reprimand by consent to resolve this matter, he would have accepted it, and there would have been no proceedings before a referee and no costs." These arguments are unavailing. The misconduct in this case is clear, and the fact that Attorney Thompson would have accepted a lesser sanction than what the referee recommended and this court has imposed is obviously not a valid reason to reduce the costs owed. Attorney Thompson's long (and unsuccessful) fight to vindicate himself has come at a cost; he will pay it in full.

¶38    IT IS ORDERED that Gary W. Thompson is publicly reprimanded for his professional misconduct.

¶39     IT IS FURTHER ORDERED that within 60 days of the date of this order, Gary W. Thompson shall pay to the Office of Lawyer Regulation the costs of this proceeding, which are $23,209.42 as of April 15, 2026.