IN the MATTER OF DISCIPLINARY PROCEEDINGS AGAINST
Michael F. HUPY, Attorney at Law:

OFFICE OF LAWYER REGULATION,
Complainant-Respondent,

v.

Michael F. HUPY, Respondent-Appellant.

Supreme Court

*No. 2007AP1281–D. Oral argument January 6, 2010.
—Decided May 27, 2011.*

2011 WI 38

(Also reported in 799 N.W.2d 732.)

614

615

616

ATTORNEY disciplinary proceeding. *Attorney publicly reprimanded.*

For the respondent-appellant there were briefs by *Jeremy P. Levinson, Joseph M. Peltz* and *Friebert, Finerty & St. John, S.C.,* Milwaukee and oral argument by *Jeremy P. Levinson.*

For the complainant-respondent there was a brief and oral argument by *Julie M. Scott, n/k/a Spoke, Office of Lawyer Regulation,* Madison.

¶ 1. PER CURIAM. Attorney Michael F. Hupy appeals from the report and recommendation of the referee, Attorney James J. Winiarski, that he be publicly reprimanded for his professional misconduct and that he be required to pay the full costs of this disciplinary proceeding. In particular, Attorney Hupy challenges the referee's conclusions that he committed three violations of the Rules of Professional Conduct for Attorneys.

¶ 2. After thoroughly reviewing the matter, the court is evenly split as to whether there is a violation of SCR 20:8.4(c) as alleged in Count 1 of the complaint filed by the Office of Lawyer Regulation (OLR). Chief Justice Abrahamson, Justice Bradley, and Justice Crooks conclude that Attorney Hupy engaged in conduct involving dishonesty, fraud, deceit or misrepresentation, in viola-

617

tion of SCR 20:8.4(c),[1] by sending out a mass-mailing postcard at issue in Count 1. Justice Prosser, Justice Roggensack, and Justice Ziegler conclude that the postcard does not constitute an ethical violation. With respect to Count 2, Chief Justice Abrahamson, Justice Bradley, Justice Crooks, and Justice Prosser conclude that Attorney Hupy violated SCR 20:8.4(c) by sending out a mass-mailing brochure to potential clients in 2006 that contained a false statement.[2] Finally, the court determines that the OLR failed to prove a violation on Count 3, which alleged that Attorney Hupy had violated former SCRs 20:7.1(a)[3] and

[1] SCR 20:8.4(c) states it is professional misconduct for a lawyer to "engage in conduct involving dishonesty, fraud, deceit or misrepresentation; . . . ."

[2] Justice Roggensack and Justice Ziegler conclude that the OLR did not prove a violation of SCR 20:8.4(c) on Count 2 and therefore dissent.

[3] Former SCR 20:7.1(a) (effective through June 30, 2007) provided as follows:

> A lawyer shall not make a false or misleading communication about the lawyer or the lawyer's services. A communication is false or misleading if it:
>
> (1) contains a material misrepresentation of fact or law, or omits a fact necessary to make the statement considered as a whole not materially misleading;
>
> (2) is likely to create an unjustified expectation about results the lawyer can achieve, or states or implies that the lawyer can achieve results by means that violate the Rules of Professional Conduct or other law;
>
> (3) compares the lawyer's services with other lawyers' services, unless the comparison can be factually substantiated; or
>
> (4) contains any paid testimonial about, or paid endorsement of, the lawyer without identifying the fact that payment has been made or, if the testimonial or endorsement is not made by an actual client, without identifying that fact.

20:7.5(a)[4] by affixing a sticker to his correspondence in 2004 that announced the "35th Anniversary" of his law firm, known at the time as Michael F. Hupy and Associates, S.C.[5]

¶ 3. We determine that a public reprimand is appropriate discipline for Attorney Hupy's professional misconduct in conducting mass mailings of a false advertising brochure. We emphasize that attorneys must be careful to ensure that the advertising materials they send to members of the public are truthful about themselves and about other attorneys.

¶ 4. There are not four justices who would reach the same result regarding the amount of costs to be imposed on Attorney Hupy. Chief Justice Abrahamson, Justice Bradley, and Justice Crooks would impose all costs, with the exception of OLR's pre-appeal attorney fees that it attempted to add in response to this court's questions at oral argument. Justice Prosser would impose a total of $35,000 in costs against Attorney Hupy. Justice Roggensack and Justice Ziegler would not impose any costs because they have concluded that the OLR failed to prove any violations against Attorney Hupy. Thus, because three justices would impose more than $35,000 in costs and Justice Prosser would impose

---

[4] Former SCR 20:7.5(a) (effective through June 30, 2007) stated:

> A lawyer shall not use a firm name, letterhead or other professional designation that violates Rule 7.1. A trade name may be used by a lawyer in private practice if it does not imply a connection with a government agency or with a public or charitable legal services organization and is not otherwise in violation of Rule 7.1.

[5] The law firm is now known as Hupy and Abraham S.C. For ease of reference, this decision will refer to the law firm as the "Hupy law firm."

$35,000 in costs, the decision of the majority of the participating justices is to impose $35,000 in costs on Attorney Hupy.

¶ 5. Attorney Hupy was admitted to the practice of law in Wisconsin in 1972. He has never before been the subject of professional discipline.

¶ 6. The first two counts of the OLR's complaint relate to advertising pieces issued by the Hupy law firm to potential clients, in which Attorney Hupy criticized Attorney Charles Hausmann. According to the referee's findings of fact, Attorney Hupy worked for Attorney Hausmann's law firm, then known as Hausmann-McNally S.C.,[6] from 1976 to 1989. In 1989 there was a falling out between Attorney Hausmann and Attorney Hupy, and Attorney Hupy left the Hausmann-McNally firm to join the law firm of Jacobson, O'Dess, and Krings S.C. At the time that Attorney Hupy left, there was considerable animosity between Attorney Hupy and Attorney Hausmann, and that animosity has continued to the present day. Both Attorney Hupy and Attorney Hausmann practice in the area of plaintiffs' personal injury law. They and their respective law firms have competed for personal injury clients since 1989.

¶ 7. In June 2002 Attorney Hausmann pled guilty to a federal charge of interstate mail and wire fraud by depriving his clients of the right to his honest services in connection with a kickback scheme with a chiropractor to whom Attorney Hausmann referred clients. The federal district court sentenced Attorney Hausmann to two months imprisonment and 16 months of supervised release. It also required Attorney Hausmann to com-

---

[6] This law firm is currently known as McNally Law Offices, S.C. It will be referenced as "Hausmann-McNally" in this decision.

620

plete 40 hours of community service and to pay $77,000 in restitution to his clients. Attorney Hausmann began serving his federal prison sentence in November 2003.

¶ 8. The OLR filed a disciplinary complaint against Attorney Hausmann in connection with his federal conviction in January 2004. That disciplinary case ended in July 2005 with this court suspending Attorney Hausmann's license for a period of one year, effective as of August 30, 2005. The referee in the present case specifically found that Attorney Hausmann had ceased practicing law prior to the effective date of his 2005 suspension. Attorney Hausmann's license was reinstated by this court in a decision dated May 17, 2007.

¶ 9. Shortly after Attorney Hausmann was sentenced, Attorney Hupy and his law firm began to include language in their advertisements to potential clients that publicized Attorney Hausmann's conviction and criticized the Hausmann-McNally firm. It has been the practice of Attorney Hupy and the firm in which he has practiced to send out every month direct mailings to a large number of individuals who have recently been involved in automobile accidents.

¶ 10. Count 1 of the OLR's complaint relates to a postcard that Attorney Hupy began to include in those direct mail packages beginning in December 2003. The postcard was entitled "Beware: You will Probably Get a Letter from a Law Firm Whose Senior Partner Went to Prison on November 28, 2003." After a greeting line of "Dear Friend," the postcard contained the following text:

> Listen to one example of what lawyer advertising has come to: Hausmann McNally law firm Senior Partner, Charles J. Hausmann, went to prison for defrauding approximately 200 of his firm's personal injury clients. He and his firm still send direct mail advertising to accident victims telling them to hire a lawyer they can

621

really trust. Lawyers can mail letters and advertise on television without ever having tried a personal injury case.

By separate mailing we have sent you a letter containing an article entitled *How to Find a Good Personal Injury Lawyer* and information about our firm. Please take the time to read this article and ask questions before you hire a lawyer.

¶ 11. The referee found that the primary purposes of the postcard (and the other direct mail pieces sent out by Attorney Hupy and his firm) were to solicit the legal business of individuals involved in automobile accidents and to discourage those individuals from hiring Attorney Hausmann and his firm. Thus, the referee concluded that the content of the postcard was commercial speech.

¶ 12. The referee also found that by placing the statement "Lawyers can mail letters and advertise on television without ever having tried a personal injury case" in the same paragraph as statements about Attorney Hausmann's conviction and the Hausmann-McNally firm, Attorney Hupy "gave recipients of the postcard the false impression that Hausmann and the lawyers at the Hausmann-McNally firm had never tried a personal injury case."[7] The referee further found that the placement of the last sentence in the first paragraph of the postcard next to statements about Attorney Hausmann and the Hausmann-McNally law firm had been done "deliberately, knowingly, and in reckless disregard of the truth."

---

[7] The referee expressly found that at the time the postcards were created and distributed all of the lawyers at the Hausmann-McNally firm had tried personal injury cases.

¶ 13. On the basis of these findings, the referee concluded that the statement about not having tried a personal injury case was "dishonest, deceitful, and misleading," and constituted a violation of SCR 20:8.4(c).

¶ 14. The referee rejected Attorney Hupy's argument that the OLR was estopped from prosecuting Count 1 because it had previously reviewed the postcard and had raised no objection. In particular, Attorney Hupy pointed to the fact that in December 2003 he had submitted the postcard to the OLR as an advertisement pursuant to SCR 20:7.3(c)[8] and the OLR had not objected to the postcard at that time as being false or misleading.[9] In addition, when a grievance was subsequently filed regarding the postcard, an OLR investigator left a voice-mail message for an attorney at the Hupy law firm stating that the investigator had not found anything wrong with the advertisement and had sent the matter to the OLR's deputy director "for closure."

¶ 15. The referee concluded that the initial review of the postcard and the voice-mail message by the OLR investigator did not estop the OLR from subsequently

---

[8] SCR 20:7.3(c) provides as follows:

Every written, recorded or electronic communication from a lawyer soliciting professional employment from a prospective client known to be in need of legal services in a particular matter shall include the words "Advertising Material" on the outside envelope, if any, and at the beginning and ending of any printed, recorded or electronic communication, unless the recipient of the communication is a person specified in pars. (a)(1) or (a)(2), and a copy of it shall be filed with the office of lawyer regulation within five days of its dissemination.

[9] As discussed below, because Attorney Hupy made this same argument on appeal, this court ordered additional memoranda on the scope of the review of advertising materials conducted by the OLR.

pursuing a claim of professional misconduct. As the voice-mail message made clear, an initial review of an advertisement does not preclude the OLR from a subsequent review if the OLR receives a grievance or determines that the advertisement is potentially in violation of the ethical rules. With respect to the investigator's statement that he had sent the subsequent grievance for closure, the referee noted that the grievance was not, in fact, closed by the deputy director, who makes the final decision, subject to review by the director, whether to close a grievance or proceed with an investigation.

¶ 16. Count 2 of the OLR's complaint related to another direct mail item that was critical of Attorney Hausmann and the Hausmann-McNally firm. This writing was in the form of an article in a direct mail brochure rather than a postcard.

¶ 17. The article, entitled "Read Mail from Lawyers Cautiously," began with the following paragraph:

> A lawyer with an office at 633 West Wisconsin Avenue in Milwaukee, who pleaded guilty to a felony after defrauding 200 personal injury clients and was sentenced to Federal prison is still practicing law pending his appeal. His law firm is still sending letters soliciting personal injury cases to people who have been involved in motor vehicle accidents. The lawyer's partner sends a 28 page brochure telling injury victims they should "Find a lawyer and law firm they can really trust." What the brochure does not tell you is that the senior partner was convicted of conduct that betrayed the trust and confidence placed in him by his clients.

¶ 18. The referee found that the lawyer referenced in this paragraph was Attorney Hausmann and the law firm was Hausmann-McNally. Attorney Hupy's

appellate brief acknowledges that while the article does not mention Attorney Hausmann or his law firm by name, a reader would likely have made that connection.

¶ 19. The brochure containing this article was initially mailed to prospective clients in November 2003. The Hupy law firm sent this brochure and article to approximately 4,000 potential clients each month for several months. The OLR did not allege and the referee did not find that the article was false or misleading when it was mailed out during this initial time period. At that time Attorney Hausmann's appeal of his criminal case was indeed pending. In addition, although Attorney Hausmann began serving his prison sentence in November 2003, his license to practice law in Wisconsin was not suspended until August 2005, when the disciplinary proceeding against him was completed. Thus, in late 2003 and early 2004 it was not false to say that Attorney Hausmann could have been practicing law pending the outcome of his federal criminal appeal while the disciplinary investigation and proceeding were in progress.

¶ 20. The referee found, however, that Attorney Hupy and his firm once again included the article in direct mailings in the period of March to November 2006. No changes were made to the article. It continued to state that Attorney Hausmann was "still practicing law pending his appeal." The referee, therefore, found that the article as reprinted in 2006 was false in two respects. First, by March 1, 2006, Attorney Hausmann's criminal appeal had been long concluded and he had even been out of prison for more than two years. Second, Attorney Hausmann's license to practice law in Wisconsin had been suspended as of August 2005, and he remained under suspension during the 2006 time period when the article was distributed a second time.

625

Although Attorney Hupy attempted to argue to the contrary, the referee explicitly found that Attorney Hausmann was not engaged in the practice of law during the suspension of his law license.

¶ 21. Thus, the referee found that the article's statement in 2006 that Attorney Hausmann "is still practicing law pending his appeal" was dishonest, deceitful, and misleading, and constituted a material misrepresentation, in violation of SCR 20:8.4(c). The referee further found that Attorney Hupy's use of that statement from March to November 2006 was done "deliberately, knowingly, and in reckless disregard of the truth."

¶ 22. The referee rejected Attorney Hupy's argument that the failure to correct any factual inaccuracies when the article was used for a second time in 2006 was merely an oversight. The referee pointed to the fact that neither Attorney Hupy nor his partner could provide evidence of periodic reviews of advertising material to ensure its factual accuracy. The referee expressly found that Attorney Hupy had intentionally turned a blind eye to the inaccurate statement:

> It is unconscionable that the respondent would draft such time sensitive advertising and then essentially "forget" about the advertising and continue its use long after it had become factually inaccurate. I do not find that the respondent simply "forgot" about the offending language, or that he never reviewed the content of the brochure, which had by then been used tens of thousands of times. Respondent chose to ignore the problem language for an extended period of time for financial gain, and for purposes of deliberately harming his major competitor.

¶ 23. The referee also rejected Attorney Hupy's contention that the statement was factually accurate in

2006 because Attorney Hausmann was indeed practicing law at that time. Although Attorney Hupy claimed that Attorney Hausmann was practicing law because his name remained on some Internet website in connection with the law firm's name and on an annual report for the Hausmann-McNally law firm service corporation, the referee found that Attorney Hausmann had not, in fact, engaged in the practice of law during his suspension. The referee made the following specific finding: "There is no evidence that [Attorney Hausmann] performed legal work on any client file or was present on the premises of the law firm when any legal business was conducted during his period of suspension."

¶ 24. Attorney Hupy made a number of other arguments against a conclusion of professional misconduct on Counts 1 and 2 relating to the postcard and brochure article. He asserted that the postcard and article were protected speech under the First Amendment because they were part of Attorney Hupy's purported campaign to educate the public about the dangers of lawyer advertising. The referee concluded, however, that both the postcard and brochure article constituted commercial speech. He noted that both Attorney Hupy and his partner acknowledged at the disciplinary hearing that the Hupy law firm had a profit motive in sending out the direct mail advertising at issue in Counts 1 and 2. Indeed, the postcard and the brochure were mailed with other documents that clearly solicited the legal business of the recipients. Having determined that the communications at issue were commercial speech, the referee concluded that neither communication was protected by the First Amendment because they contained false and misleading statements. *Zauderer v. Office of Disciplinary Counsel of the Supreme Court of Ohio*, 471 U.S. 626, 638 (1985) ("The States and the Federal Gov-

ernment are free to prevent the dissemination of commercial speech that is false, deceptive, or misleading, . . . .").

¶ 25. Attorney Hupy also argued that he could not be found in violation of SCR 20:8.4(c) on Counts 1 and 2 because the OLR was obligated under that rule to prove that he had actual knowledge or "substantial doubt" as to the falsity of the statements. The referee responded that SCR 20:1.0(h) defines "misrepresentation" as the "communication of an untruth, either knowingly or with reckless disregard." In addition, the rule states that a person's knowledge may be inferred from the circumstances of the communication. The referee found that Attorney Hupy had knowingly made false statements in the two direct mail pieces. First, he found that Attorney Hupy knew that at the time the postcard was distributed Attorney Hausmann and the lawyers at Hausmann-McNally had tried personal injury cases. Second, he found that Attorney Hupy knew in 2006 that the statement that Attorney Hausmann was still practicing law pending his appeal was false. Attorney Hausmann's appeal had ended well before that time and his license to practice law had also been suspended. Attorney Hupy did not show that at the time of the second use of the brochure article in 2006 he had knowledge of any facts to support the statement that Attorney Hausmann was still practicing law pending his criminal appeal.

¶ 26. The referee rejected Attorney Hupy's claim that Counts 1 and 2 violated due process because SCR 20:8.4(c) did not give him sufficient notice of what communications are prohibited. The referee concluded that the prohibition against engaging in "conduct involving dishonesty, fraud, deceit or misrepresentation" provided sufficient notice such that a reasonable attorney, with knowledge of the Wisconsin Supreme Court rules,

would know that he or she could not make false advertising claims like the ones made by Attorney Hupy in the postcard and brochure article.

¶ 27. The referee also rejected Attorney Hupy's contention that Counts 1 and 2 should have been charged under SCR 20:7.1, which prohibits false or misleading communications about a lawyer or the lawyer's services, rather than SCR 20:8.4(c). The referee stated that it was within the OLR's discretion as to what charges to pursue. In addition, the referee noted that the factual findings he had made would also have supported finding violations of SCR 20:7.1.

¶ 28. Count 3 of the OLR's complaint involved Attorney Hupy's use of a sticker on his firm's letterhead in 2004 that indicated that Michael F. Hupy and Associates, S.C., as the firm was then known, was celebrating its 35th anniversary. The OLR alleged that this sticker constituted a material misrepresentation about Attorney Hupy and his law firm, in violation of SCR 20:7.1(a) and SCR 20:7.5(a), because Attorney Hupy's "purchase" of a service corporation in 1997 did not allow him to trace the lineage of his then-current law firm all the way back to 1969, as the sticker indicated.

¶ 29. Attorney Hupy has not been associated with the same firm throughout his legal career. After graduating from law school in 1972, he worked as an associate attorney for a firm by the name of Eisenberg, Kletchke, and Eisenberg. As noted above, from 1976 to 1989 Attorney Hupy was an associate attorney, a partner, and then a shareholder with the Hausmann-McNally law firm.

¶ 30. In 1989 Attorney Hupy left Hausmann-McNally to become an associate attorney with the law firm then known as Jacobson, O'Dess, and Krings, S.C. The first attorney listed in that firm name was Attorney Thomas Jacobson.

¶ 31. Attorney Hupy became a shareholder in Jacobson, O'Dess, and Krings, S.C., either later in 1989 or in 1990. At some time thereafter the name of that law firm was changed to Jacobson and Hupy S.C. At that point Attorney Jacobson and Attorney Hupy were the only two shareholders in the service corporation.

¶ 32. In late 1996 Attorney Hupy and Attorney Jacobson decided to part ways. They ultimately entered into a Stock Redemption and Compensation Agreement (the Redemption Agreement), which took effect as of January 1, 1997. Pursuant to the Redemption Agreement, the service corporation purchased all of Attorney Jacobson's shares, leaving Attorney Hupy as the sole shareholder in the corporation. Attorney Jacobson then left the firm to start up a new law firm. Attorney Hupy subsequently changed the name of the service corporation to Michael F. Hupy and Associates, S.C.

¶ 33. In paragraph 19 of the Redemption Agreement, Attorney Jacobson and Attorney Hupy agreed that after Attorney Jacobson left the firm each of them would "have the sole and exclusive right to the use of their respective names and such names may not be used (in a firm name or otherwise) by the other for purposes of engaging in the practice of law . . . ."

¶ 34. The OLR essentially alleged in Count 3 that because Attorney Hupy had not been associated with the Jacobson and Hupy law firm until 1989 and had agreed in the Redemption Agreement not to use Attorney Jacobson's name after 1997, it was a misrepresentation for him to claim in 2004 that his law firm was celebrating its 35th anniversary.

¶ 35. Attorney Hupy argued that the 35th anniversary sticker used in 2004 was not a misrepresentation because the history of the firm he owned as of 2004 could be traced back to at least 1969. This led the

referee to make findings regarding Attorney Jacobson's legal career and the firm(s) he owned and ultimately transferred to Attorney Hupy's control.

¶ 36. From 1962 to 1967 Attorney Jacobson practiced in a law firm by the name of "Barbee & Jacobson." In 1967 Attorney Jacobson and Attorney Barbee each took the legal files on which they were working and went their separate ways. Attorney Jacobson then began to practice law as a sole proprietor under the name "Law Offices of Thomas Jacobson." In 1969 Attorney David Melnick began working for Attorney Jacobson. According to Attorney Melnick, he soon became a partner with Attorney Jacobson, but he could not state whether that occurred in 1969 or 1970. Once the partnership was formed, the law firm went by the name of "Jacobson and Melnick."

¶ 37. In 1972 Attorneys Jacobson and Melnick "merged" with the practice of Attorneys Boris Sodos and Sid Sodos. The firm in which the four lawyers practiced together was known initially as "Sodos, Jacobson, Sodos, and Melnick." Attorney Melnick described the arrangement between the four attorneys as a partnership, but testified that it was not "formalized." For example, when Attorney Boris Sodos left the arrangement shortly after it came into existence, "all he did was take his practice with him." No money exchanged hands when Attorney Sodos allegedly gave up his partnership interest. The name of the law firm simply changed to "Jacobson, Sodos, and Melnick."

¶ 38. The referee found that the witnesses at the disciplinary hearing were unaware of any written partnership agreements. The referee further found that if there had been an oral partnership agreement, there was little evidence presented as to what the terms of the agreement had been. Indeed, there was no evidence as

to the terms and conditions by which each partner had joined or left the firm between 1970 and 1974. The referee commented that the testimony suggested more of an office-sharing arrangement than a true law firm partnership, although there was evidence of the splitting of some fees between the partners. The referee ultimately concluded that the evidence supported a series of separate partnerships with different partners rather than one continuing partnership with additional partners joining and exiting. As support for this conclusion, the referee pointed to the fact that the name of the firm changed each time a new partner was added or an existing partner left.

¶ 39. In 1974 the remaining partners incorporated their practice as a service corporation. The referee found, however, that the shareholders of the service corporation continued to operate with much of the same informality that marked the period from 1970 to 1974.

¶ 40. From 1974 to 1989 shareholders joined and left the service corporation, and the law firm changed names at least three times. As noted, Attorney Hupy joined the firm in 1989 and soon thereafter became a shareholder. The name of the law firm/service corporation then became "Jacobson & Hupy."

¶ 41. The referee concluded that it was misleading for Attorney Hupy to claim the lineage of the firm or firms that Attorney Jacobson had owned prior to 1997. First, the referee pointed to paragraph 19 of the Redemption Agreement, which the referee interpreted to mean that, after January 1, 1997, Attorney Hupy could not use any of the pre-1997 history of the firm that had been associated with Attorney Jacobson. Even if Attorney Hupy was allowed under the Redemption Agreement to use Attorney Jacobson's "history," the referee

concluded that at most Attorney Hupy could trace the history of the law firm known in 2004 as Michael F. Hupy and Associates, S.C. only back to Attorney Jacobson's incorporation of the service corporation in 1974. The referee believed that any history that existed prior to that incorporation date belonged only to Attorney Jacobson, not Attorney Hupy, because Attorney Hupy was not part of any pre-1974 arrangements. Moreover, the referee concluded that the pre-1974 arrangements were a series of separate partnerships rather than a single, ongoing partnership that changed into a corporate form in 1974.

¶ 42. Because the referee determined that Attorney Hupy could not validly trace the lineage of his firm back to 1969, he concluded that the use of the 35th anniversary sticker in 2004 without any additional explanation was a misrepresentation about Attorney Hupy and his firm's name and letterhead, in violation of SCRs 20:7.1(a) and 20:7.5(a). The referee further stated that a discrepancy of even five years regarding the founding date of the firm was a material misstatement because it was made by Attorney Hupy in an attempt to influence the choice of a law firm by potential clients.

¶ 43. Having found that Attorney Hupy had committed professional misconduct on all three of the counts set forth in the OLR's complaint, the referee turned to the issue of the proper level of discipline.

¶ 44. The referee properly stated the primary factors this court considers when assessing the appropriate level of discipline: (1) the seriousness, nature, and extent of the professional misconduct, (2) the level of discipline needed to protect the public, the courts, and the legal system from repetition of the attorney's misconduct, (3) the need to impress upon the attorney the seriousness of the misconduct, and (4) the need to

633

deter other attorneys from engaging in similar misconduct. *See In re Disciplinary Proceedings Against Arthur,* 2005 WI 40, ¶ 78, 279 Wis. 2d 583, 694 N.W.2d 910. The referee determined that the misconduct he had found on Counts 1 and 2 was serious because it had been intentionally deceptive and misleading in an attempt to gain a competitive advantage over another lawyer. The referee also concluded that a public form of discipline was needed to impress upon Attorney Hupy and other attorneys the seriousness of engaging in such improper advertising, especially since Attorney Hupy had attempted to portray the inaccurate statements in the postcard and brochure as minor and insignificant.

¶ 45. The referee noted a number of aggravating and mitigating factors. On the aggravating side, the referee stated that Attorney Hupy's misconduct had stemmed from a dishonest and selfish motive and that he had demonstrated a pattern of improper advertising that had resulted in multiple counts of misconduct. Further, the referee concluded that Attorney Hupy's misconduct had caused harm both to the public and to another law firm. Finally, the referee emphasized that Attorney Hupy had demonstrated little appreciation for the seriousness of his misconduct, and indeed, had refused to acknowledge the wrongful nature of his actions. The referee stated that Attorney Hupy's claim that he had disseminated the false advertisements for an "educational" purpose was both inaccurate and troublesome.

¶ 46. On the mitigating side of the ledger, the referee did note that Attorney Hupy had not previously been the subject of professional discipline and that he had been cooperative during the OLR's investigation of his conduct.

¶ 47. Ultimately, the referee stated that the OLR's request for a public reprimand appeared to be lenient,

but fell within the range of appropriate discipline for the three counts of misconduct he found. The referee therefore recommended that Attorney Hupy be publicly reprimanded. He also recommended that Attorney Hupy be required to pay the full costs of this disciplinary proceeding.

¶ 48. Before turning to Attorney Hupy's arguments on appeal from the referee's report and recommendation, we discuss the standard of review that we will apply. Generally, when reviewing a referee's report and recommendation in attorney disciplinary proceedings, we will affirm a referee's findings of fact unless they are found to be clearly erroneous. *See In re Disciplinary Proceedings Against Inglimo*, 2007 WI 126, ¶ 5, 305 Wis. 2d 71, 740 N.W.2d 125. We review the referee's conclusions of law, however, on a de novo basis. *See id.* Finally, we determine the appropriate level of discipline given the particular facts of each case, independent of the referee's recommendation, but benefiting from it. *See In re Disciplinary Proceedings Against Widule*, 2003 WI 34, ¶ 44, 261 Wis. 2d 45, 660 N.W.2d 686.

¶ 49. Attorney Hupy contends, however, that we should apply a standard of independent review because he raises First Amendment arguments. We agree to the limited extent that we are called upon to decide First Amendment issues and to apply First Amendment law to the facts of this case. As to those issues, U.S. Supreme Court precedent requires us to conduct an independent examination of the record to determine whether Attorney Hupy's conduct is within or without the free speech protections of the First Amendment. *See Bose Corp. v. Consumers Union of United States, Inc.*, 466 U.S. 485, 514 & n.31 (1984) (federal rule of civil procedure requiring finding of fact to be clearly erroneous before

being overturned did not apply to determination of First Amendment issue of actual malice, but clearly erroneous standard could be applied to findings of fact not relevant to the First Amendment issue).

¶ 50. Attorney Hupy's appeal challenges all three of the counts of misconduct found by the referee. Some of his arguments apply to one specific count while others apply to multiple counts. We will address each count in turn.

¶ 51. On Count 1, the referee found that Attorney Hupy's mailing of the postcard containing the sentence "Lawyers can mail letters and advertise on television without ever having tried a personal injury case" constituted conduct involving dishonesty, fraud, deceit, or misrepresentation, in violation of SCR 20:8.4(c).

¶ 52. All four of the descriptive words used in SCR 20:8.4(c) require that there be an untruth. Attorney Hupy begins his challenge to Count 1 on the grounds that neither the OLR's allegations nor the evidence demonstrated that the postcard contained a "specific, concrete, and meaningfully inaccurate representation of fact." He notes that the OLR's complaint alleged that the challenged sentence in the postcard created a false or misleading impression that the lawyers in the Hausmann-McNally firm had advertised without ever having tried a personal injury case.

¶ 53. Attorney Hupy contends that there is no evidence in the record to show what impression was made on any recipient of the postcard. No recipient of the postcard testified. According to Attorney Hupy, those individuals that did testify gave differing views as to whether the challenged sentence referred to Attorney Hausmann, all of the lawyers at the Hausmann-McNally law firm, or lawyers generally. If the sentence referred either to Attorney Hausmann individually or

to the lawyers at the Hausmann-McNally firm collectively, the statement would have been untrue. On the other hand, if the sentence simply referred to lawyers generally, it is true in theory that lawyers can mail letters and advertise on television without ever having tried a personal injury case. In Attorney Hupy's view, since the recipients of the postcard did not testify that they viewed the challenged sentence as referring specifically to Attorney Hausmann or the lawyers at the Hausmann-McNally firm, the OLR failed to prove that the sentence was untrue.

¶ 54. Attorney Hupy further argues that the simple juxtaposition of the challenged sentence next to other sentences that specifically referred to Attorney Hausmann and the Hausmann-McNally firm is not enough to render the sentence untrue and a basis for imposing sanctions. He argues that the U.S. Supreme Court's decision in *Peel v. Attorney Registration and Disciplinary Commission of Illinois,* 496 U.S. 91 (1990), rejected the notion that the juxtaposition of true statements can create a misleading impression that can be prohibited or penalized. He contends that without evidence that recipients in fact were misled, the only support for a finding that the sentence was false or misleading is an unproven hypothesis that the recipients viewed the challenged sentence as referring to Attorney Hausmann or the lawyers in the Hausmann-McNally law firm.

¶ 55. Attorney Hupy also argues that the evidence does not show that he made the statement in the postcard with the required knowledge of falsity or reckless disregard for the truth. He starts from the premise that the referee did not find the challenged sentence to involve dishonesty, fraud, or deceit because those terms require intentionality by the actor/speaker,

but instead relied solely on the final term in SCR 20:8.4(c)—misrepresentation.[10] He then points to the definition of misrepresentation in SCR 20:1.0(h), which defines the term as "communication of an untruth, either knowingly or with reckless disregard, whether by statement or omission, which if accepted would lead another to believe a condition exists that does not actually exist."

¶ 56. Attorney Hupy asserts that the definition of "reckless disregard" should be further developed by reference to civil defamation law. In particular, he points to the court of appeals' statement in *Biskupic v. Cicero*, 2008 WI App 117, ¶ 27, 313 Wis. 2d 225, 756 N.W.2d 649, that to demonstrate reckless disregard, a complainant "must show that the defendant in fact entertained serious doubts as to the publication's truth." He therefore argues that the OLR was required to show by clear and convincing evidence that he recognized the impression of the sentence that the OLR now claims to be misleading and in fact had serious doubts as to whether that impression was true.

¶ 57. Attorney Hupy contends that the OLR cannot meet this standard because there is no evidence that he ever believed the challenged statement in the postcard referred to the lawyers in the Hausmann-McNally law firm. He points to the fact that both he and his law partner testified at the disciplinary hearing that they believed the sentence referred only to lawyers generally and was meant only to be a general criticism of lawyer advertising. He contends that the only thing the OLR was able to present was ambiguity or differing

---

[10] Paragraph 21 in the referee's findings of fact, however, states that the statement in the postcard "is dishonest, deceitful, and misleading."

638

potential interpretations of the sentence, which are not sufficient evidence of a false statement.

¶ 58. The OLR responds that to establish a violation of SCR 20:8.4(c) it is not required to plead or prove the tort of misrepresentation or to demonstrate that an attorney engaged in an outright fraud. It points to the language of the rule, which prohibits attorneys from engaging in conduct *involving* dishonesty, fraud, deceit, or misrepresentation. It further emphasizes that the rule does not require it to establish specific intent; recklessness by an attorney in making a statement is sufficient for a violation of the rule.

¶ 59. In response to Attorney Hupy's claim that the use of the challenged sentence in the postcard was essentially an innocent oversight, the OLR points to the referee's finding that the placement of the challenged sentence in the same paragraph as criticisms of Attorney Hausmann and the Hausmann-McNally law firm was done deliberately and knowingly to give recipients the impression that Attorney Hausmann and the lawyers in the Hausmann-McNally law firm had not tried personal injury cases. The OLR emphasizes that the sentence at issue was placed in an advertisement that began with the following headline: "Beware: You Will Probably Get A Letter From A Law Firm Whose Senior Partner Went To Prison On November 28, 2003." Thus, the OLR argues that the postcard was clearly intended to refer to Attorney Hausmann and the Hausmann-McNally law firm.

¶ 60. Attorney Hupy also continues to argue that the OLR should be estopped from proceeding with any claim related to the postcard because (1) it approved (or at least did not object to) the postcard when Attorney Hupy originally submitted a copy of it to the OLR pursuant to SCR 20:7.3(c), and (2) after a grievance

regarding the postcard was subsequently filed by the OLR, an OLR investigator left a voice-mail message for Attorney Hupy's partner indicating that he would be sending the grievance for closure. Attorney Hupy essentially asserts that because the OLR did not object to the postcard and in his view closed the subsequent grievance relating to the postcard, it would be impermissibly arbitrary for the OLR to "reopen" the matter and pursue an ethical charge that is based on the postcard.

¶ 61. Following oral argument, this court directed the OLR to submit an additional memorandum discussing the scope of its review of advertising materials under SCR 20:7.3 and the nature of its procedures for communicating with attorneys who have submitted materials pursuant to SCR 20:7.3(c). The OLR's response explains that its review under SCR 20:7.3(c) is generally limited to determining whether the submitted document has been properly labeled as "Advertising Material" as required by SCR 20:7.3(c). The submitted advertisement is not specifically reviewed for its content, unless there is patently visible language that raises an unmistakable issue of possible misconduct, in which case the OLR may begin an investigation. The OLR further states that it generally will not send any communication to the submitting attorney if the advertisement has been properly labeled. If the submitting attorney affirmatively asks for a positive response following the OLR's consideration, the OLR will generally advise the attorney only that the submitted document complies with SCR 20:7.3. On the other hand, if the advertisement is not properly labeled, the OLR will also notify the attorney of that fact. The OLR emphasizes that it does not ever communicate that a submitted advertisement has been "approved" or "authorized for

use." Thus, the review of an advertisement by the OLR under SCR 20:7.3(c) and the lack of any objection by the OLR following that review should not be taken as a stamp of approval that the advertisement complies with all ethical rules.

¶ 62. With respect to Attorney Hupy's argument regarding the voice-mail message left by its investigator, the OLR contends that the voice-mail message cannot form the basis for any estoppel because, despite the investigator's stated intention to send the grievance regarding the postcard to the OLR's deputy director for closure, the referee expressly found that the grievance was never, in fact, closed. Instead, the deputy director determined that the matter should be forwarded for a formal investigation. The OLR argues that because it never communicated a final decision to Attorney Hupy, it cannot be estopped from pursuing a course of action contrary to the initial course of action suggested by the investigator.

¶ 63. As noted above, the court is evenly split with respect to whether the statement in the postcard constituted a violation of SCR 20:8.4(c). Chief Justice Abrahamson, Justice Bradley, and Justice Crooks conclude the message of the postcard was that lawyers in the Hausmann-McNally firm had advertised without having tried a personal injury case, which constituted conduct involving dishonesty, fraud, deceit, or misrepresentation in violation of SCR 20:8.4(c). Justice Prosser, Justice Roggensack, and Justice Ziegler conclude that the OLR has not proven that the specific statement at issue in the postcard was a misrepresentation. Because the court is evenly split as to whether there was a violation on Count 1, we need not further address Attorney Hupy's constitutional and other challenges to the application of SCR 20:8.4(c) to the postcard.

641

¶ 64. With respect to Count 2, Attorney Hupy's initial argument is that the brochure article at issue did not contain any meaningful inaccuracy and the referee relied on an overly literal construction of the phrase "is still practicing law pending his appeal." He emphasizes that the challenged statement that Attorney Hausmann is still practicing law pending his appeal was accurate when the brochure was written and initially distributed in 2003. He contends that for a number of reasons he should not be found to have violated SCR 20:8.4(c) because he reprinted and distributed the same article in 2006.

¶ 65. First, he asserts that the premise of the article was a criticism of the lawyer regulatory system for allowing Attorney Hausmann to practice law after he had been convicted of a felony. He therefore contends that this "message" of criticism remained true in 2006, even if one sentence of the article had become outdated. He argues that his opinion on a matter of public concern should not be transformed into professional misconduct due to a "technical debate of the verb tense of an isolated phrase."

¶ 66. Attorney Hupy's brief also claims that the article did not expressly identify Attorney Hausmann, which supports his assertion that the article had a larger focus on criticism of lawyer advertising and lawyer regulation.

¶ 67. Next Attorney Hupy asserts that Attorney Hausmann was, in fact, still practicing law in 2006 when the article at issue was reprinted. He points to the fact that an annual corporate report filed by the Hausmann-McNally firm with a state agency in 2005, which remained on file in March 2006, identified Attorney Hausmann as a shareholder, officer, and director of the law firm. He also points to the fact that Attorney

Hausmann remained a shareholder of the service corporation and received a certain type of compensation from the Hausmann-McNally firm during his suspension. He asserts that, at a minimum, there was enough evidence of Attorney Hausmann's practice of law in 2006 that the issue was debatable and that he therefore cannot be found to have made a knowing misrepresentation.

¶ 68. Attorney Hupy also makes a number of arguments that pertain to both Counts 1 and 2. We did not reach these arguments with respect to Count 1 due to the even split in the participating members of the court. We address them now in connection with Count 2.

¶ 69. Attorney Hupy contends that any misstatement in the article as reprinted in 2006 was a technical inaccuracy that cannot be the basis for professional discipline because it does not call into question his fitness to practice law. In other words, Attorney Hupy asserts that SCR 20:8.4(c) must be interpreted to prohibit only misrepresentations that reflect adversely on a lawyer's fitness to practice law because a broader scope of the rule could significantly inhibit a lawyer's exercise of his/her free speech rights. As support for this position, Attorney Hupy points to this court's decision in *In re Disciplinary Proceedings Against Beaver,* 181 Wis. 2d 12, 22, 510 N.W.2d 129 (1994), in which we stated that the context of the term "offensive personality" in the attorney's oath[11] and its application to attorney disciplinary proceedings required that it be limited to conduct that reflects adversely on a person's fitness as a lawyer.

---

[11] The attorney's oath taken by all attorneys who are licensed to practice in this state, now located in SCR 40.15, states in pertinent part, "I will abstain from all offensive personality and advance no fact prejudicial to the honor or reputation of a party or witness, unless required by the justice of the cause with which I am charged; . . . ."

¶ 70. He also argues that he cannot be found to have violated SCR 20:8.4(c) because the OLR did not submit proof that he reprinted the article in 2006 with actual knowledge of, or reckless disregard for, the allegedly false statement in the reprinted article. He says that in March 2006, when the article was reprinted verbatim, he did not perceive that the events that had occurred between 2003 and 2006 warranted a review of the statements in the article and "was not actually aware that the three year old article contained the specific, challenged phrase."

¶ 71. Next Attorney Hupy asserts that applying SCR 20:8.4(c) to the reprinted article would cause the rule to "violate principles of due process by denying attorneys fair notice of what is prohibited." He argues that SCR 20:8.4(c) does not provide lawyers with sufficient notice that it imposes standards for the accuracy of advertising communications, especially since such communications are also subject to SCRs 20:7.1 through 20:7.5.

¶ 72. Finally, Attorney Hupy argues that SCR 20:8.4(c) must not be interpreted to apply to the reprinted article because such an interpretation would infringe on his free speech rights under the United States and Wisconsin constitutions. He asserts, contrary to the referee's conclusion, that the brochure article is not commercial speech because it does not propose a transaction. *See City of Milwaukee v. Blondis,* 157 Wis. 2d 730, 735, 460 N.W.2d 815 (Ct. App. 1990) ("Commercial speech is speech that proposes a commercial transaction."). Thus, he contends that the article deserves the fullest protection of the First Amendment because it discusses matters of public interest. He asserts that the "inexact standards" propounded by the OLR and the referee regarding the application of SCR

20:8.4(c) would not meet the strict scrutiny applied to political speech because those standards do not serve the government interests typically served by rules that discipline individuals for engaging in fraud or misrepresentation.

¶ 73. In addition, Attorney Hupy contends that even if the brochure article is characterized as commercial speech, it cannot form the basis for professional discipline because suppressing the article or disciplining Attorney Hupy for it would serve only the private interests of Attorney Hausmann rather than the interests of the public in deterring misleading speech by attorneys.

¶ 74. The OLR responds that the referee's finding of a violation is supported by the record. It asserts that by March 1, 2006, it was clear that Attorney Hausmann had been out of prison for more than two years and that his criminal appeal had already been completed for a long time, making the challenged statement undoubtedly false. It points to the referee's credibility determinations that Attorney Hupy did not simply forget about the statement in the article that Attorney Hausmann was still practicing law pending his appeal and that Attorney Hupy chose to ignore the falsity of that statement for an extended period of time for his own financial gain and in order to harm a competing lawyer.

¶ 75. The OLR contends that sending out the mailing again in 2006 was not an innocent mistake. It states that if Attorney Hupy and his partner had reviewed all advertising communications prior to their circulation, as Attorney Hupy's brief asserts, he would have known that the article was no longer correct in 2006. Thus, the OLR argues that the circulation of the reprinted article was done at least with reckless disregard.

¶ 76. The OLR disputes that Attorney Hausmann was practicing law during his suspension in 2006. It emphasizes that the referee expressly found that Attorney Hausmann was not practicing law at that time. It points to the referee's statement that Attorney Hausmann and the Hausmann-McNally firm "went to great lengths to comply with all parts of the suspension order," including changing all signage, letterhead, advertising, etc., and hiring outside counsel to advise them on complying with the order. Moreover, the OLR stresses that in 2006, when the brochure article was used for the second time, Attorney Hupy had no knowledge of any of the actions by Attorney Hausmann and the law firm that he now claims constituted the practice of law by Attorney Hausmann. Attorney Hupy developed that evidence only after the fact when facing charges in this disciplinary proceeding.

¶ 77. With respect to Attorney Hupy's First Amendment claims, the OLR notes that commercial speech, including attorney advertising, can be regulated or prohibited if it is false, deceptive, or misleading. *Zauderer,* 471 U.S. at 637–38. The OLR contends that the referee appropriately concluded that the brochure article was commercial speech because the primary purpose of the article was to solicit business and to harm a major competitor. It further asserts that the brochure article is not entitled to First Amendment protection because the statement about Attorney Hausmann still practicing law in 2006 was untruthful and Attorney Hupy knew it was untruthful.

¶ 78. Under our standard of review, we first determine that the referee's findings of fact are not clearly erroneous. We therefore adopt those findings and use them to determine whether the use of the brochure article in 2006 was a violation of SCR 20:8.4(c).

¶ 79. We conclude that the facts as found by the referee show that Attorney Hupy did violate SCR 20:8.4(c) by mailing to prospective clients in 2006 a brochure containing the statement that an attorney, who was clearly Attorney Hausmann, "is still practicing law pending his appeal."

¶ 80. We first address Attorney Hupy's contention that the brochure article did not identify Attorney Hausmann by name. Although the article did not use Attorney Hausmann's name, it clearly identified him by giving the address of the Hausmann-McNally law firm and referring to him as the attorney who had pled guilty to defrauding personal injury clients. Indeed, Attorney Hupy's opening brief to this court acknowledged that the article referred to Attorney Hausmann.

¶ 81. We also do not agree with Attorney Hupy's claim that he cannot be disciplined for using the article in 2006 because the article contained only a technical inaccuracy. We acknowledge that the "still practicing" statement in the article was accurate when it was first disseminated in 2003. Attorney Hupy acknowledges, on the other hand, that the statement was not true when the article was reprinted verbatim in 2006 because by that time Attorney Hausmann's criminal appeal had been completed and his license to practice law in Wisconsin had been suspended. The statement was clearly a misrepresentation of fact when it was made again in 2006. That it was a repetition of a formerly true statement does not change its nature as a false statement in 2006.

¶ 82. We further reject Attorney Hupy's argument that the false statement cannot be a violation of SCR 20:8.4(c) because it was not substantial enough and did not relate to Attorney Hupy's fitness to practice law.

647

The statement in the article made in 2006 asserted that Attorney Hausmann was still practicing law. This is not a de minimis accusation. Since Attorney Hausmann's license to practice law in this state was suspended at that time, Attorney Hupy's statement was an accusation that Attorney Hausmann was violating this court's suspension order, a serious allegation of professional misconduct.

¶ 83. Moreover, without deciding whether a misrepresentation must relate to an attorney's fitness to practice law in order to be a violation of SCR 20:8.4(c), we conclude that Attorney Hupy's misrepresentation here does implicate his fitness to practice law. Thus, even under the standard Attorney Hupy desires, his statement in the brochure article violates the rule. He made a clearly false statement about one of his primary competitors in a brochure that was part of a direct mail advertising package sent to a targeted audience of potential clients. Making false statements about a competing lawyer in order to obtain more clients for one's self clearly implicates one's fitness to exercise the privilege of practicing law in this state.

¶ 84. Indeed, that conclusion is supported by the fact that another rule of professional conduct explicitly prohibits making false or misleading communications about the lawyer or the lawyer's services. *See* SCR 20:7.1. If it is an ethical violation to make a false or misleading statement about one's self in a communication with prospective clients, there is no reason why it should not also be an ethical violation to make a false statement about a competing lawyer in such a communication. Both types of statements may wrongly influence a potential client's decision about which lawyer to retain or not retain.

¶ 85. We next address Attorney Hupy's contention that the statement at issue was not a misrepresentation because Attorney Hausmann was "still practicing law" in 2006. In order to prevail on this argument, Attorney Hupy must demonstrate that the referee's findings of fact were clearly erroneous. Specifically, the referee found that (1) "there is no evidence in this case that [Attorney] Hausmann practiced law during his suspension" and (2) "[t]here is no evidence that he performed legal work on any client file or was present on the premises of the law firm when any legal business was conducted during his period of suspension."

¶ 86. It is important to recognize that the statement in the brochure article was not meant for an audience of legal ethics professors, but for the general public, specifically potential personal injury clients. Thus, the phrase "is still practicing law" must be read according to its ordinary meaning of representing clients. None of the evidence on which Attorney Hupy relies supports a finding that Attorney Hausmann was doing anything related to the representation of clients. Regardless of whether or not Attorney Hausmann should have relinquished his shares in the service corporation during the period of his suspension, an issue we need not decide in this proceeding, merely passively owning shares in a service corporation, without more, does not mean that Attorney Hausmann was "practicing law" as that phrase is generally understood. Moreover, the 2005 corporate report cited by Attorney Hupy was filed before Attorney Hausmann's suspension took effect. It does not undercut the referee's finding that Attorney Hausmann was not practicing law in early 2006, especially given the fact that the 2006

corporate report showed that Attorney Hausmann was no longer president of the service corporation.

¶ 87. In a related vein, Attorney Hupy argues that he should not be disciplined for the article because the OLR did not prove that he was reckless in stating that Attorney Hausmann was still practicing law in early 2006. We disagree that there is no evidence to support a conclusion that Attorney Hupy acted recklessly.

¶ 88. First, the referee found that Attorney Hupy was aware of the suspension of Attorney Hausmann's license to practice law in August 2005. Indeed, Attorney Hupy had his firm's outside legal counsel stand outside the Hausmann-McNally firm's offices on the date the suspension took effect in 2005 to ensure that Attorney Hausmann's name had been removed from all signage. This was not a situation where Attorney Hupy was ignorant of what the situation was at the time that he republished the brochure in 2006.

¶ 89. Second, Attorney Hupy's brief in this court points to contradictory statements that demonstrate that Attorney Hupy's second publication of the brochure article was done either knowingly or recklessly. First, Attorney Hupy points to testimony by himself and his partner that they reviewed all communications written for circulation by their firm to ensure their accuracy. On the other hand, Attorney Hupy's brief contends that he "was not actually aware that the three year old article contained the specific, challenged phrase" or that the passage of time warranted review of the contents of the article. Given Attorney Hupy's knowledge of the suspension and the steps taken by Attorney Hausmann and his firm to comply with the suspension order, if Attorney Hupy did actually review the brochure article in early 2006, as he claims he

always did, he would have noticed that the article falsely stated that Attorney Hausmann was still practicing law pending his criminal appeal. Thus, his continued use of that brochure article would have been with knowledge of the article's falsity regarding that statement. On the other hand, if Attorney Hupy was not actually aware in early 2006 that the article contained the allegation that Attorney Hausmann was still practicing law, then he could not have reviewed the article prior to using it a second time. Publishing a statement, especially a statement that a fellow lawyer is violating a supreme court order, without knowing the contents of the statement, is a quintessential act of recklessness.

¶ 90. Third, it is important to note that the referee explicitly found that Attorney Hupy looked for and created the reasons he now gives as proof of Attorney Hausmann practicing law in early 2006 only well after the brochure had been published again in March 2006 and even after the grievance against him in this matter had been filed with the OLR.

■

¶ 91. Attorney Hupy's claim that SCR 20:8.4(c) violates his due process rights because it is too vague to provide an attorney with notice of what is prohibited has previously been rejected by this court. *In re Disciplinary Proceedings Against Schalow,* 131 Wis. 2d 1, 13, 388 N.W.2d 176 (1986). In that case, Attorney Schalow alleged that the prohibition against engaging in "conduct involving dishonesty, fraud, deceit or misrepresentation," located at the time in SCR 20.04(4), was overbroad and vague. After noting that there needs to be a greater degree of flexibility with respect to vagueness in attorney disciplinary rules than in criminal statutes, we concluded that the rule against conduct involving dis-

honesty, fraud, deceit or misrepresentation provided sufficient notice of prohibited conduct to satisfy due process:

> Our rule, SCR 20.04(4), while set forth in general and, arguably, less than definite terms, is neither so indefinite as to leave a lawyer, at his or her peril, to guess its meaning nor so lacking in ascertainable standards as to render it constitutionally infirm.

*Id.* Attorney Hupy's arguments do not convince us otherwise. At a minimum, the rule provided sufficient notice to Attorney Hupy that attorneys licensed in this state must avoid making false statements about other lawyers in advertising communications to potential clients.

¶ 92. We also reject Attorney Hupy's claim that imposing discipline on him for republishing the statement in the brochure article in 2006 would violate his free speech rights. First, we conclude, as did the referee, that the brochure article constituted commercial speech. Attorney Hupy contends that the article was not commercial speech because it did not expressly propose a commercial transaction. The brochure article, however, was not distributed as a stand-alone communication. It was part of a packet of materials that Attorney Hupy and his firm sent to potential personal injury clients. The brochure article was clearly meant to act together with the other materials in the packet to convince the recipient to contact Attorney Hupy and his firm so that a client relationship could be formed, or at least discussed. The use of the brochure in an ongoing direct mail advertising campaign belies Attorney Hupy's claim that the brochure article was

simply intended to educate or advise the public about the dangers of lawyer advertising.

¶ 93. Having concluded that the brochure article was commercial speech, we have no trouble concluding that the statement in the article was not protected by either the First Amendment of the United States Constitution or Article I, section 3 of the Wisconsin Constitution, even under an independent standard of review. While commercial speech generally merits some protection under the First Amendment, that protection does not extend to commercial speech that is false, deceptive, or misleading. *Zauderer*, 471 U.S. at 638. Because the statement in the article that Attorney Hausmann was still practicing law pending his appeal was clearly false when it was republished in 2006, the First Amendment does not protect Attorney Hupy from being disciplined for that ethical violation.

¶ 94. We next turn to Count 3 of the complaint, which involved Attorney Hupy's use of a 35th anniversary sticker on his firm's letterhead in 2004. In addition to raising many of the same arguments he made with respect to Counts 1 and 2, Attorney Hupy contends that the referee effectively shifted the burden of proof from the OLR to him. Specifically, he contends that there was a stipulation that the law firm corporation had a continuous existence back to 1974 and that the referee's conclusion that the law firm's existence did not extend back to 1969 was based on a finding that there was insufficient evidence to conclude that there was one continuous partnership between 1969 and 1974 instead of a series of partnerships. He asserts that the referee therefore required him to prove that there had been one continuous partnership between 1969 and 1974 rather

than requiring the OLR to prove that there had been a series of separate partnerships.

¶ 95. Attorney Hupy also contends that the referee's finding of fact that the law firm he owned in 2004 could not trace its existence back to at least 1969 is erroneous. He asserts that the various lawyers associated with the firm over the years all testified that the firm never ceased to exist after 1969 and that they understood the firm's founding date to be no later than 1969.

¶ 96. In addition, Attorney Hupy argues that the referee erred in making an unsubstantiated determination that a difference between a 1974 founding date and a 1969 founding date was material. He notes that the OLR submitted no evidence regarding the materiality of any such difference, while his expert witness opined that no reasonable consumer would make a decision on hiring a law firm based on a difference of a few years in its founding date.

¶ 97. Although it acknowledges that there has never before been an attorney disciplinary case involving the founding date of a law firm, the OLR contends that the referee's finding of a violation here should be upheld. It urges that under Wisconsin partnership law, the burden of proof should be on the party claiming that a single partnership existed prior to 1974, which would be Attorney Hupy. It further asserts that Attorney Hupy did not demonstrate that a single partnership existed prior to 1974 because there was insufficient evidence to establish that the individuals who practiced together prior to 1974 actually had a community of interest in the capital employed by them, had equal voices in the management of a single entity, and shared the profits and losses of a single organization, which are all elements necessary to create a valid partnership under Wis.

Stat. ch. 178. *See Stern v. Dep't of Revenue,* 63 Wis. 2d 506, 509–10, 217 N.W.2d 326 (1974). With respect to the question of materiality, the OLR simply points to the referee's statement that a reasonable client would have felt misled if he or she had later learned that the 35th anniversary sticker had been false.

¶ 98. We conclude that Count 3 can be resolved on the issue of materiality. Supreme court rule 20:7.1 prohibits a lawyer from making false or misleading communications about the lawyer or the lawyer's services. Former SCR 20:7.1(a) explains that a communication is false or misleading if it "contains a material misrepresentation of fact or law or omits a fact necessary to make the statement considered as a whole not materially misleading." It is therefore clear that a false or misleading statement about the attorney or the attorney's services must be material for there to be a violation of the rule.

¶ 99. First, we address the referee's comments about the Redemption Agreement under which Attorney Jacobson sold all of his shares back to the service corporation, leaving Attorney Hupy as the remaining shareholder. Because the Redemption Agreement contained a provision that each attorney would have the exclusive right to the use of their respective names, the referee stated that Attorney Hupy had improperly made use of Attorney Jacobson's name and history by using the date on which Attorney Jacobson started the firm in which Attorney Hupy is now a shareholder.

¶ 100. We disagree that the Redemption Agreement prohibited Attorney Hupy from communicating about the date when the firm which he now partially owns was started. Placing a 35th anniversary sticker on

the firm's letterhead did not use Attorney Jacobson's name in violation of the contractual provision. The referee points to no contractual provision that prohibited Attorney Hupy from speaking about the history of the legal service corporation he solely owned following the redemption of Attorney Jacobson's shares. Thus, since there is no dispute that this service corporation was incorporated in 1974 and has been in continuous existence as a law firm since that time, we find no reason why Attorney Hupy could not make statements in 2004 that the law firm of which he was then an owner had at least a 1974 founding date.

¶ 101. Given this background, the question of materiality becomes clearer. The issue is not whether a potential client or other reader of the anniversary sticker would find the difference between a 35th anniversary sticker and no anniversary sticker material. Attorney Hupy was entitled at least to communicate in 2004 that the law firm he then owned was 30 years old. The true question presented is therefore whether a potential client or other reader would have found it to be a material difference if the sticker had read "30th Anniversary" instead of "35th Anniversary." We agree with Attorney Hupy that no reasonable person would be influenced by a five-year difference between a personal injury law firm that was either 30 years old or 35 years old. In other words, we do not believe that any reasonable person would have retained Attorney Hupy's law firm on the belief that it was 35 years old but would not have retained the firm if he/she knew that it was really only 30 years old. Consequently, because we determine that the anniversary sticker, even if false or misleading, was not material, we conclude that Attorney Hupy's use of the sticker was not a violation of former SCRs 20:7.1(a) or 20:7.5(a).

¶ 102. With a majority of the court having concluded that Attorney Hupy violated SCR 20:8.4(c) by recirculating a brochure article in early 2006, as alleged in Count 2 of the OLR's complaint, we address the proper level of discipline. We conclude that a public reprimand is appropriate in this situation.

¶ 103. We acknowledge that Attorney Hupy has not previously been the subject of professional discipline and that he cooperated with the OLR's investigation. We agree with the referee, however, that the use of the brochure article with the false statement in early 2006 was a serious violation that requires a public reprimand. As the referee found, Attorney Hupy sent out a false statement essentially alleging that one of his primary lawyer competitors was violating this court's suspension order and engaging in unethical conduct in order for Attorney Hupy to gain a competitive advantage over the other lawyer. This not only harmed the other lawyer, but more importantly harmed the public. Indeed, it harmed a portion of the public that may very well have been looking for legal representation at the time it received the brochure article. Moreover, this was not a false statement made to a limited number of potential clients. It is clear that Attorney Hupy and his firm included this false statement in mailings that were sent to thousands of individuals who had recently been involved in a vehicle collision and therefore may have been potential clients.

¶ 104. Moreover, the referee found that Attorney Hupy has little appreciation for the seriousness of his misconduct. The referee found troublesome Attorney Hupy's attempt to justify his false statement about Attorney Hausmann as being part of an "educational"

plan rather than acknowledging that he should not have mailed out the same brochure in 2006 when it now contained a false statement about a competing lawyer. Although a lawyer accused of misconduct may certainly litigate the matter, we agree with the referee's finding that it strains credulity too far to claim that a brochure that Attorney Hupy labeled as "advertising" and directed to individuals who were likely to be considering hiring a lawyer was merely "educational." Attorney Hupy's failure to acknowledge the true nature of the brochure article and the seriousness of the false statement within it counsels in favor of public discipline in this case.

¶ 105. In addition, although every disciplinary case is unique, there are precedents that support the imposition of a public reprimand for a violation like the one committed by Attorney Hupy. *See, e.g., In re Disciplinary Proceedings Against Campbell,* 113 Wis. 2d 715, 335 N.W.2d 881 (1983) (accepting stipulation and imposing public reprimand on attorney who falsely advertised that he was a partner in a law firm rather than an employee); Public Reprimand of James S. Lindgren, 2010–8 (consensual public reprimand imposed on attorney who used law firm letterhead indicating he had continuing and full affiliation with law firm when he had either no status or of counsel status for a limited purpose); Public Reprimand of Nancy L. Bergstrom, 2009–4 (consensual public reprimand imposed on attorney with no prior discipline who issued press release containing false statement).

¶ 106. Finally, we address the issue of the costs of this proceeding. Prior to the appeal in this matter, the OLR submitted a statement of costs that requested a pre-appeal cost assessment of $45,916.88 against Attorney Hupy. Of that amount, $29,356.42 was for the

referee's fees and expenses. The OLR requested $6,174.00 in attorney fees for 88.2 hours of work and $630.86 in disbursements.

¶ 107.　Attorney Hupy made a number of objections to this requested amount and asked that the costs be reduced. Specifically, he contended that the majority of the OLR's allegations against him had been shown to be baseless. He further argued that the misconduct found by the referee was subject to dispute and that he should not be required to pay such high costs when he was acting in the public interest by educating the public about lawyer advertising. Attorney Hupy also specifically objected to the amount of the referee's fees. He asserted that the number of hours the referee had spent on this case (481.6 hours) was excessive because it was nearly five times greater than the 88.2 hours identified by the OLR. He requested that the referee's fees be reduced so that they correlated with the number of hours requested by the OLR.

¶ 108.　At oral argument, this court questioned OLR's counsel about its fee records. Specifically, we noted that it appeared that the OLR's billing itemization did not contain entries for at least some dates on which the disciplinary hearing had been held. OLR's counsel responded that she would review the billing records.

¶ 109.　Following oral argument, the OLR submitted a "supplemental and amended" statement of costs. Most of the costs were the same as in the original statement, including the fees requested for the referee. However, in addition to adding a request for the fees it incurred during this appeal (35 hours and $2,450), the OLR also stated that after reviewing its time records, its counsel had discovered an additional 58.53 hours of pre-appellate work, which increased its pre-appellate

fees from $6,174 to $10,271.11, a difference of $4,097.11. The total amount requested by the OLR in its "supplemental and amended" statement of costs was $52,463.99.

¶ 110. Attorney Hupy did not object to the fees incurred by the OLR on appeal, but he did restate his earlier objections and did specifically raise a new objection to the OLR's increased request for pre-appellate fees. He noted that the OLR had offered no explanation for how or why the increased pre-appellate fees had been omitted from the OLR's initial statement of costs, which he claimed deprived him of an opportunity to evaluate them. In addition, he contended that the submission of those additional pre-appellate fees came months after the deadline for such fee requests, which was 20 days after the filing of the referee's report. *See* SCR 22.24(2).

¶ 111. In response, the OLR acknowledged that its counsel had made mistakes in listing her pre-appellate hours in its original statement of costs. It asserted, however, that it should be allowed to correct its mistake. It claimed that its supplemental statement was timely because the rules allow the OLR to file a supplemental statement when an appeal is filed. *See* SCR 22.24(2) (supplemental statement of costs may be filed within 14 days after an appeal is assigned for submission to the court or briefs ordered by the court are filed). To the extent that the pre-appellate fee request was increased after the filing of the appeal, the OLR simply contended that the time limit for initial cost statements is not jurisdictional and should be extended here.

¶ 112. First, we address the OLR's "amendment" of its pre-appellate fees in its post-appellate statement

of costs. The four justices who have found a violation on Count 2 (Chief Justice Abrahamson, Justice Bradley, Justice Crooks, and Justice Prosser) conclude that in the present case the OLR should be bound by the hours and fees that it submitted in its original statement of costs. The rules do require that the OLR is to submit its primary statement of costs within 20 days after the filing of the referee's report. SCR 22.24(2). That initial statement of costs should set forth all of the OLR's fees through the time of the referee's report. The "supplemental" statement of costs that is contemplated in cases where an appeal is filed is designed to allow the OLR to add fees and expenses that it incurred during the appellate process. It is not intended to allow the OLR to change its pre-appellate fee request, at least not without a demonstration of some valid reason for doing so.

¶ 113. In this situation the OLR has not provided an adequate reason for why it failed to include all of its counsels' hours in the original statement of costs. This was not a situation where some inadvertently overlooked entry was immediately corrected. Indeed, the OLR was not even aware that its listing of hours could not possibly be complete until this court brought the issue to its attention at oral argument. Moreover, the OLR has provided no explanation as to how the additional hours it is now requesting were discovered or recovered after oral argument. Without that sort of explanation, we have no way of knowing whether that process, which was clearly outside of the normal process, produced a reliable listing of hours expended and fees incurred. Thus, having eliminated the OLR's "amended" pre-appellate fees, the largest amount of costs that could be imposed on Attorney Hupy would be $48,366.88.

¶ 114. Three members of this court (Chief Justice Abrahamson, Justice Bradley, and Justice Crooks) conclude that Attorney Hupy should be liable for this amount. They note that under the current version of SCR 22.24(1m),[12] the court's general policy is, upon a finding of misconduct, to impose all costs upon the respondent attorney, unless the attorney is able to demonstrate extraordinary circumstances. They conclude that, with the exception of the "amended" preappellate costs denied above, Attorney Hupy has not provided an adequate reason to deviate from the court's general practice of imposing full costs.

¶ 115. The fourth justice who has determined that Attorney Hupy engaged in at least one count of misconduct (Justice Prosser) believes that the costs in this proceeding should be reduced to some degree. Justice Prosser believes that a relatively small reduction in the costs is appropriate in this case given that

---

[12] SCR 22.24(1m) provides:

The court's general policy is that upon a finding of misconduct it is appropriate to impose all costs, including the expenses of counsel for the office of lawyer regulation, upon the respondent. In cases involving extraordinary circumstances the court may, in the exercise of its discretion, reduce the amount of costs imposed upon a respondent. In exercising its discretion regarding the assessment of costs, the court will consider the submissions of the parties and all of the following factors:

(a) The number of counts charged, contested, and proven.

(b) The nature of the misconduct.

(c) The level of discipline sought by the parties and recommended by the referee.

(d) The respondent's cooperation with the disciplinary process.

(e) Prior discipline, if any.

(f) Other relevant circumstances.

Attorney Hupy has been found to have engaged in misconduct on only one out of the three counts the OLR alleged. In addition, Justice Prosser notes that this disciplinary proceeding did not stem from Attorney Hupy's betrayal of his clients. Rather, it stemmed initially from a dispute between competing attorneys. Moreover, given the nature of the misconduct at issue, the end result of this proceeding will be a public reprimand on an attorney who has never previously been disciplined. Justice Prosser concludes that it would simply be unfair to impose nearly $50,000 in costs on Attorney Hupy under these circumstances.

■■■

¶ 116. Consequently, although there are four justices who would impose costs, there is not full agreement among those four justices as to the amount of costs. Three justices would impose costs in excess of $35,000 and one justice would impose costs of $35,000. Because there must be at least four justices out of the six participating justices to form a majority for any result, there is a majority only to impose $35,000 in costs on Attorney Hupy. Four justices agree that costs of at least $35,000 should be imposed. There are not four justices who agree on any higher cost amount. Thus, the court determines that Attorney Hupy must pay costs in this proceeding in the amount of $35,000.

¶ 117. To summarize, the court is evenly split with respect to whether Attorney Hupy's use of a postcard stating that lawyers can mail letters and advertise on television without ever having tried a personal injury case violated SCR 20:8.4(c). A majority of the court concludes that Attorney Hupy's distribution of a brochure article in early 2006 that indicated Attorney Hausmann was still practicing law pending his criminal appeal constituted conduct involving a

misrepresentation, in violation of SCR 20:8.4(c). The court further concludes that Attorney Hupy's use of a 35th anniversary sticker on his firm's letterhead in 2004 was not a violation of former SCRs 20:7.1(a) or 20:7.5(a). Given the violation of SCR 20:8.4(c) in connection with the brochure article, the court determines that Attorney Hupy should be publicly reprimanded for his professional misconduct. Finally, a majority of the court concludes that Attorney Hupy should be required to pay costs in the amount of $35,000.

¶ 118. IT IS ORDERED that Michael F. Hupy is publicly reprimanded for his professional misconduct.

¶ 119. IT IS FURTHER ORDERED that within 60 days of the date of this order, Michael F. Hupy pay to the Office of Lawyer Regulation costs in the amount of $35,000. If the costs are not paid within the time specified and absent a showing to this court of his inability to pay the costs within that time, the license of Michael F. Hupy to practice law in Wisconsin shall be suspended until further order of the court.

¶ 120. MICHAEL J. GABLEMAN, J., did not participate.

¶ 121. PATIENCE DRAKE ROGGENSACK, J. and ANNETTE KINGSLAND ZIEGLER, J. (*dissenting*). We conclude that the Office of Lawyer Regulation has failed to meet its burden to prove any of the counts alleged in the Complaint. Accordingly, we would dismiss the Complaint against Attorney Hupy and we respectfully dissent from the majority opinion.